In re Arthur Lee CHERRY,
III, Debtor.

Arthur Lee Cherry, III, Plaintiff,

v.

Dennis M. Arendall, Defendant.

Bankruptcy No. 93–21955–B.
Adversary No. 99–2148–S.

United States Bankruptcy Court,
E.D. Virginia,
Norfolk Division.

March 8, 2000.

Carl E. Eason, Jr., Suffolk, VA, for Debtor.

Charles L. Marcus, Portsmouth, VA, trustee.

## MEMORANDUM OPINION AND ORDER

STEPHEN C. ST. JOHN, Bankruptcy Judge.

This matter came on for trial, on February 8, 2000, upon the Complaint of Arthur Lee Cherry, III ("Cherry") against Dennis M. Arendall ("Arendall"). This Memorandum Opinion and Order constitutes the findings of fact and conclusions of law of this Court pursuant to Federal Rule of Bankruptcy Procedure 9012.

### FINDINGS OF FACT

Few material facts appear to be in dispute here. Originally, Cherry was an employee of Cherry Carpets, Inc. in Portsmouth, Virginia, an enterprise Cherry and other family members owned. Cherry sold his interest in the family business in 1990, and as a condition of sale, he entered into a non-competition agreement with the

purchasers. A number of years earlier, Cherry had met Arendall at a trade convention and the two remained in sporadic contact because of their respective carpet businesses. After leaving his family firm, Cherry contacted Arendall to explore joining Arendall's carpet company, DMA & Associates ("DMA"), located in Richmond, Virginia.

Arendall hired Cherry and Cherry commenced work at DMA in February, 1991 as a sales assistant at an approximate salary of $38,000.00 annually. After Arendall hired him, the purchasers of Cherry's prior business interest sued Cherry, Arendall and DMA, alleging, among other things, that Cherry had violated the terms of his non-competition agreement by entering into the employ of DMA. Cherry concluded that he needed to retain counsel separate from the counsel Arendall & DMA had retained to defend the allegations, but was without sufficient monies to do so.

Upon Cherry's request, Arendall personally loaned Cherry $5,000.00 to retain an attorney. A note prepared by Ms. Eunice Peatross, the bookkeeper and treasurer of DMA ("Peatross"), evidenced this obligation. The note, dated April 18, 1991, was for the principal sum of $5,000.00 payable on the demand of Arendall and accrued interest at the rate of twelve percent (12%) per annum. Subsequently, Arendall advanced additional monies to fund Cherry's defense. A note dated September 24, 1991 in the original principal amount of $7,500.00, also prepared by Peatross, evidenced the first of these additional advances. This note was payable to Arendall on demand with interest accruing at twelve percent (12%) per annum. A final advance from Arendall occurred about one year later. This loan, for $5,000.00, was evidenced by a note dated September 30, 1992, also payable on demand with twelve percent (12%) interest per annum (the

three notes shall, as a group, be referred to as the "Original Notes").

Meanwhile, notwithstanding the necessity of defending against the litigation prosecuted by his prior business associates, Cherry advanced at DMA. Cherry received several salary increases and, by 1993, occupied the position of Acting President of DMA. Despite his ever increasing remuneration, however, Cherry experienced financial difficulties and concluded that he would file for protection under the Bankruptcy Code. Cherry filed his petition under Chapter 7 of the Bankruptcy Code in this Court on April 14, 1993.[1] Among the creditors listed on his Schedule F was Arendall, who was scheduled for personal loans in the amounts of $5,000.00, $7,500.00 and $5,000.00 respectively. Notice of Cherry's bankruptcy filing was mailed to Arendall on April 16, 1993. Peatross testified that she received the notice of Cherry's bankruptcy at DMA's place of business, and that she personally gave the notice to Arendall.

The sole factual dispute centers around the circumstances relating to the execution of the Replacement Notes. Cherry was approached by Arendall at some undetermined time after filing and advised Arendall of Cherry's filing. Cherry expressed his sorrow over the necessity of filing and, according to Arendall, agreed to repay the amounts the Original Notes represented. Peatross recalled being in a meeting with both Cherry and Arendall where Arendall directed her to create new notes, to which Cherry agreed. Peatross drafted three new notes, each drafted May 1, 1993, that were respectively identical to the Original Notes, except for their face amounts of $6,000.00, $9,000.00 and $6,250.00 ("Replacement Notes"). Each face amount was calculated based on the original principal amounts of each Original Note plus all interest accrued thereon through May 1,

---

[1]. Cherry's case was closed on August 17, 1993. Cherry moved to reopen this case to permit the filing of the instant adversary proceeding, which motion was granted by an order entered on September 13, 1999.

1993.[2] No new monies or any other new consideration was advanced at the time of the making of these notes. Cherry executed the Replacement Notes in the presence of Arendall and Peatross.[3] On July 30, 1993, Cherry was discharged from all debts dischargeable under 11 U.S.C. § 523. A copy of the order of discharge was mailed to Arendall on the same date.[4]

Cherry continued in the employ of DMA, receiving continued salary increases and Arendall initiated no demand for payment of the Replacement Notes nor any other collection efforts. Cherry made no payments on the Replacement Notes while working for DMA. Cherry elected to terminate his employment with DMA in 1994. Subsequent to Cherry leaving DMA, Arendall had three meetings or conversations with Cherry seeking repayment of the Replacement Notes; in each instance, Cherry advised that he was working on a plan of repayment, but no specific plan was ever proposed to Arendall. Arendall also contacted Cherry's present employer and, in the course of discussing other matters, inquired about Cherry's ability to repay him. Arendall additionally contacted Cherry's brother to inquire whether Cherry was included as a beneficiary under his late father's trust agreement. Cherry and Arendall also confronted each other at a bid opening in Richmond, where Arendall publicly cursed Cherry in expressing his disdain for Cherry's failure to repay the Replacement Notes.

Arendall retained counsel for the purpose of collection of the Replacement Notes. Counsel contacted Cherry at least once to compel payment. In June 1999, Arendall caused to be filed in a Virginia state court a Motion for Judgment seeking the entry of judgment against Cherry by reason of the Replacement Notes ("Motion for Judgment"). The Motion for Judgment in paragraph 4 thereof acknowledges that, at some time after the execution of the Original Notes, Cherry filed bankruptcy and named Arendall as a creditor. Subsequent to the filing of the Motion for Judgment, counsel for Cherry, in a telephone conversation and in a letter dated July 8, 1999, advised Arendall of Cherry's contention that the filing of the Motion for Judgment was a violation of § 524 of the Bankruptcy Code. Cherry demanded that the Motion for Judgment be dismissed or Cherry would attempt to have Arendall held in contempt for violation of the Bankruptcy Code. Arendall declined to dismiss

2. Cherry prior to May 1, 1993 had made no payments upon the Original Notes.

3. Cherry's recollection of the events surrounding the preparation and execution of the Replacement Notes differs from that of Arendall and Peatross. Cherry apparently recalled no meetings with Arendall or Peatross concerning his bankruptcy. Rather, after filing his petition in bankruptcy, Cherry testified that Peatross confronted him at DMA's offices with the Replacement Notes to sign, Cherry asked what would happen if he did not sign the Replacement Notes, to which Peatross allegedly replied he may then be unemployed. Cherry then signed the Replacement Notes. Peatross had no recollection of this conversation and the Court believes that Arendall's version of the events surrounding the making of the Replacement Notes, as largely collaborated by Peatross, is the more credible testimony.

4. The discharge order provided, in pertinent part:

IT IS ORDERED that
1. The above-named debtor is released from all dischargeable debts.
2. Any judgment heretofore or hereafter obtained in any court other than this court is null and void as a determination of the personal liability of the debtor with respect to any of the following:
(a) debts dischargeable under 11 U.S.C. sec. 523;
(b) unless heretofore or hereafter determined by order of this court to be nondischargeable, debts alleged to be excepted from discharge under clauses (2), (4) and (6) of 11 U.S.C. sec. 523(a);
3. All creditors whose debts are discharged by this order and all creditors whose judgments are declared null and void by paragraph 2 above are enjoined from instituting or continuing any action or employing any process or engaging in any act to collect such debts as personal liabilities of the above-named debtor.

the Motion for Judgment and Cherry initiated the instant Complaint in this Court on September 21, 1999. Cherry subsequently amended his Complaint.[5]

In his Amended Complaint, Cherry alleges that the Replacement Notes failed to contain certain language required by 11 U.S.C. § 523(c)(3) and that neither these notes nor any other agreement was filed with this Court as § 523(c)(3) also requires. The Complaint filed by Cherry also alleges that Arendall sought to enforce the Replacement Notes in a Virginia state court despite requests by Cherry to desist Arendall's enforcement attempts. Cherry requests the Court to find Arendall in contempt for violating the discharge order and an award of compensatory and punitive damages, costs and attorney's fees.

Arendall in his Answer admitted the Original Notes failed to contain the language as set forth in 11 U.S.C. § 524(c) and that neither the Original Notes nor any other agreement of Arendall with Cherry was filed with this Court, but denied any violation of the discharge order. Arendall counterclaimed against Cherry praying for an entry of judgment in the amount owed under the terms and conditions of the Replacement Notes.[6]

Arendall both initiated and continued prosecution of the Motion for Judgment after receiving the advice of his legal counsel. Cherry has incurred attorney's fees and costs in the defense of the Motion for Judgment and in the prosecution of the instant Complaint in the amount of $6,000.00. Cherry never made payments on the Replacement Notes.

This Court must resolve only one discrete point. It is undisputed that the Replacement Notes do not comply with the requirements of 11 U.S.C. § 524(c) concerning the required substance of reaffirmation agreements. It is similarly undisputed that neither the Replacement Notes nor any other agreement between Cherry and Arendall was ever filed with this Court as § 524(c) also requires. Rather, Arendall's sole defense rests with his contention that Cherry's making of the Replacement Notes was a "voluntary repayment" of the Original Notes that the provisions of 11 U.S.C. § 524(f) save from voidability. Arendall reasons that (1) he and Cherry mutually intended that the Replacement Notes be executed to cause the repayment of the Original Notes and (ii) Cherry's execution of the Replacement Notes was entirely voluntary on his part. Thus, Arendall argues, the provisions of 11 U.S.C. § 524(f), which purport to preserve the ability of a debtor to voluntarily repay any debt, operate to except this circumstance from the admitted failure to comply with the requirements for reaffirmation found in 11 U.S.C. § 524(c). Arendall points the Court to what he contends are the unique non-coercive circumstances of the making of the Replacement Notes, believing that the instant case does not demonstrate the concerns of coercive, non-voluntary reaffirmations that the enactment of § 524(c) enactment purportedly sought to remedy. Cherry argues that Arendall's reasoning is specious, believing that compliance with § 524(c) provides the exclusive basis upon which a debt otherwise dischargeable may be reaffirmed and therefore survive the bankruptcy discharge.

## CONCLUSIONS OF LAW

I. Liability for Failing to Adhere to 11 U.S.C. § 524(c) and (d).

A bankruptcy discharge operates as an injunction forbidding the commencement or continuation of an action, the employ-

---

5. An order was entered on November 22, 1999 to permit the filing by Cherry of the Amended Complaint which corrected two erroneous references and an improper syntax usage which appeared in the original complaint.

6. Cherry alleges in his Amended Answer to Counterclaim that this Court is without subject matter jurisdiction to hear the Counterclaim.

ment of process, or an act, to collect, recover or offset any discharged debt as a personal liability of a debtor. *See* 11 U.S.C.A. § 524(a)(2) (1999); *Van Meter v. American State Bank*, 89 B.R. 32, 33 (W.D.Ark.1988).[7] Section 524(c) of the Bankruptcy Code, which expressly limits the enforceability of an agreement between a claim holder and a debtor where the consideration for such an agreement is founded in whole or in part upon debt that is dischargeable in bankruptcy, further expands the discharge's effect.[8]

The provisions of § 524(c), enacted in substance in 1970, make void any reaffirmation agreements except those made in compliance with these requirements. *See Van Meter*, 89 B.R. at 34. In 1984 Congress added § 524(f), which provides that nothing contained in § 524(c) "prevents a debtor from voluntarily repaying any debt." 11 U.S.C.A. § 524(f) (1999). It is the relationship of these two subsections that requires exploration here.

■■■ Subject to certain exceptions enumerated in § 523, § 727 of the Bank-

ruptcy Code discharges a debtor from all debts that have arisen before the date of the order for relief. *See Lompa v. Price (In re Price)*, 871 F.2d 97, 98 (9th Cir. 1989). Section 524(a) of the Bankruptcy Code permanently enjoins all creditor actions to collect debts discharged under § 727. *See Poule v. Registrar of Contractors (In re Poule)*, 91 B.R. 83, 87 (9th Cir. BAP 1988). The purpose of the permanent injunction set forth in § 524 and reiterated in the discharge order is to effectuate one of the primary purposes of the Bankruptcy Code, to afford the debtor a financial fresh start. *See In re Latanowich*, 207 B.R. 326, 334 (Bankr.D.Mass. 1997) (citing *Green v. Welsh*, 956 F.2d 30, 33 (2nd Cir.1992)). Congress designed and intended the permanent injunction "to give complete effect to the discharge, to eliminate any doubt concerning the effect of the discharge as a total prohibition on debt collection efforts," and to ensure that "once a debt is discharged, the debtor will not be pressured in any way to repay it." *Id.* (citing S.Rep. No. 989, 95th Cong., 2d

---

**7.** A proceeding to prosecute a violation of the discharge injunction is a core proceeding. See *In re Barbour*, 77 B.R. 530, 532 (Bankr. E.D.N.C.1987).

**8.** 11 U.S.C. § 524(c), as in effect at the time of the execution of the Replacement Notes, provided as follows:

(c) An agreement between a holder of a claim and the debtor, the consideration for which, in whole or in part, is based on a debt that is dischargeable in a case under this title is enforceable only to any extent enforceable under applicable nonbankruptcy law, whether or not discharge of such debt is waived, only if—
(1) such agreement was made before the granting of the discharge under section 727, 1141, 1228, or 1328 of this title;
(2) such agreement contains a clear and conspicuous statement which advises the debtor that the agreement may be rescinded at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of rescission to the holder of such claim;
(3) such agreement has been filed with the court and, if applicable, accompanied

by a declaration or an affidavit of the attorney that represented the debtor during the course of negotiating an agreement under this subsection, which states that such agreement—
(A) represents a fully informed and voluntary agreement by the debtor; and
(B) does not impose an undue hardship on the debtor or a dependent of the debtor;
(4) the debtor has not rescinded such agreement at any time prior to discharge or within sixty days after such agreement is filed with the court, whichever occurs later, by giving notice of recission to the holder of such claim;
(5) the provisions of subsection (d) of this section have been complied with; and
(6)(A) in a case concerning an individual who was not represented by an attorney during the course of negotiating an agreement under this subsection, the court approves such agreement as—
(i) not imposing an undue hardship on the debtor or a dependent of the debtor; and
(ii) in the best interest of the debtor.
(B) Subparagraph (A) shall not apply to the extent that such debt is a consumer debt secured by real property.
11 U.S.C.A. § 524(c)(1992).

Sess. 80–81 (1978), *reprinted in* 1978 U.S.C.C.A.N., 5787, 5866; H.R.Rep. No. 595, 9th Cong., 1st Sess., 365–366 (1977)).

■ While the debtor may enter into an agreement with a creditor to reaffirm an otherwise dischargeable debt, the agreement will be binding only if made in strict compliance with § 524(c) and (d)[9] of the Bankruptcy Code. *See Republic Bank v. Getzoff (In re Getzoff)*, 180 B.R. 572, 573 (9th Cir. BAP 1995); *In re Bowling*, 116 B.R. 659, 663 (Bkrtcy.S.D.Ind.1990); *In re Gardner*, 57 B.R. 609, 611 (Bankr.D.Me. 1986). A reaffirmation agreement which does not comply with § 524 is void and unenforceable. *See In re Getzoff*, 180 B.R. at 573; *Cox v. Zale Delaware, Inc.*, 242 B.R. 444, 446 (N.D.Ill.1999); *Lindale Nat'l Bank v. Artzt (In re Artzt)*, 145 B.R. 866, 868 (Bkrtcy.E.D.Tex.1992). Inasmuch as the requirements of § 524 are mandatory, the debtor cannot waive them. See *In re Latanowich*, 207 B.R. at 335.[10]

Here, Arendall has conceded that the Replacement Notes do not comply with the requirements of § 524(c) and (d); rather, Arendall argues that the making of the Replacement Notes constituted a voluntary payment by Cherry that the provisions of § 524(f) protect. Specifically, Arendall urges this Court to conclude that Cherry "voluntarily" made the Replacement Notes, which Arendall intended to be and accepted as "payment" of the Original Notes. Arendall argues these circumstances remove the instant matter from the coercive reaffirmations § 524 forbids.

■ Congress provided little insight as to its motivation in adopting § 524(f) concerning voluntary payments; no legislative history accompanied its passage. Colliers' succinctly opines that § 524(f) "states the obvious." 4 Collier on Bankruptcy, ¶ 524.06 at 524–39 (L. King 15th Ed. Rev. 1998). An examination of the decisions considering the import of § 524(f) make it plain, however, that this language must be read in conjunction with the provisions of § 524(c) and (d) and not in negation of these reaffirmation mandates.

In particular, decisions that have considered circumstances similar to those at bar have rejected Arendall's argument that the Replacement Notes can be a "novation,"

---

**9.** At the time the Replacements Notes were executed, section 524(d) of the Bankruptcy Code read, in relevant part:

> (d) In a case concerning an individual, when the court has determined whether to grant or not to grant a discharge under section 727, 1141, 1228, or 1328 of this title, the court may hold a hearing at which the debtor shall appear in person. At any such hearing, the court shall inform the debtor that a discharge has been granted or the reason why a discharge has not been granted. If a discharge has been granted and if the debtor desires to make an agreement of the kind specified in subsection (c) of this section, then the court shall hold a hearing at which the debtor shall appear in person and at such hearing the court shall—
> (1) inform the debtor—
> (A) that such an agreement is not required under this title, under nonbankruptcy law, or under any agreement not made in accordance with the provisions of subsection (c) of this section; and
> (B) of the legal effect and consequences of—

> (i) an agreement of the kind specified in subsection (c) of this section; and
> (ii) a default under such an agreement;
> (2) determine whether the agreement that the debtor desires to make complies with the requirements of subsection (c)(6) of this section, if the consideration for such agreement is based in whole or in part on a consumer debt that is not secured by real property of the debtor.

11 U.S.C.A. § 524(d) (1992).

**10.** As Judge Tice of this Court aptly has observed:

> In order to waive the discharge of a particular debt, the debt must be reaffirmed pursuant to 11 U.S.C. § 524 regardless of any agreement to except the debt from discharge. A contrary holding would be in direct conflict with the intent of Congress to give debtors a fresh start. Thus, any waiver of the discharge of a particular debt must follow the procedures prescribed in the bankruptcy code and rules (citations omitted).

*In re Catron*, 186 B.R. 194, 196 (Bankr. E.D.Va.1995).

which in effect repays the original pre-petition obligation of a debtor. In *In re Lowery*, 187 B.R. 761 (Bankr.M.D.Fla. 1995), the debtor at the time of her original filing owed a secured obligation to a credit union. The institution was listed as a creditor and participated in the bankruptcy proceeding by filing a motion for relief from automatic stay. After receipt of her discharge, the debtor executed a new promissory note to the credit union in the amount of the original obligation plus $2,000.00 in attorney fees that the credit union incurred. The credit union argued that the post discharge note the creditor executed was a new obligation and not a reaffirmation, or merely a rewriting, of the old discharged obligation. This was rejected by the court:

> This Court is constrained to reject this proposition for the simple reason that it is clear from this record that the [new] Promissory Note executed by the Debtor ... was the identical of the original Note, albeit it included $2,000 in attorney fees, which also related to the original discharged obligation. The new Note was secured by the identical collateral .... There is no record in this record that this Debtor received any additional consideration for the execution of this new Promissory Note, with the possible exception that the Note carried a 12% annual rate of interest, however, while the original Note carried a rate of 14% per annum .... Thus, even disregarding the contention that the execution of the second Note by the Debtor was the result of improper pressure or coercion of which there is no evidence in this record, there is no question that

the second Note was nothing more than a disguised reaffirmation agreement which was not executed in compliance with the requirements set forth in § 524(c) and most importantly was never approved by this court.

*Id.* at 763. *See also In re Mickens*, 229 B.R. 114, 118 (Bankr.W.D.Va.1999) ("Clearly, allowing a debtor to sign a note which places him under the same obligation which he was subject to pre-discharge does not constitute a voluntary repayment by the debtor nor does it leave the debtor in a position to make a voluntary repayment under § 524(f)"); *In re Getzoff*, 180 B.R. at 574 ("[I]n executing the Second Guaranty, [the debtor] assumed the continuing guaranty obligation that had been discharged in his bankruptcy case. Section 524(a) bars the Bank from trying to recover this debt without observing the requirements of Section 524(c) and (d).").

Arendall's argument that Cherry is not the type of debtor that Congress intended to protect with the reaffirmation requirements of § 524(c) and (d) is also misplaced. As the Ninth Circuit Bankruptcy Appellate Panel has stated:

> Section 524 does not state that its application is limited to unsophisticated debtors. Applying Section 524 only to unsophisticated debtors would exceed judicial authority. Whether a debtor was coerced or pressured by a creditor is immaterial, as no reaffirmation is enforceable unless it is made in compliance with Section 524(c) and (d).

*In re Getzoff*, 180 B.R. at 574.[11] The foreclosure by Congress of a court's inquiry

---

11. *Accord, In re Gardner*, 57 B.R. at 610. ("Lack of such pressure, however, makes no difference here. The agreement must comply with Section 524(c) to be enforceable"); *In re Bowling*, 116 B.R. at 664. ("The fact that [the creditor] did not coerce or pressure the Debtors into reaffirming the debt makes no difference; no reaffirmation is enforceable unless it is made in compliance with Sections 524(c) and (d)"); *Smurzynski v. General Finance Corp. (In re Smurzynski)*, 72 B.R. 368,

370 (Bankr.N.D.Ill.1987) ("If [the creditor] has taken steps to enforce its agreement and collected a portion of the debt previously discharged in bankruptcy, and the plaintiff has paid money in response to [the creditor's] collection efforts, the Plaintiff's "voluntary repayments" are not voluntary at all, but are made pursuant to [the Creditor's] collection efforts. This is hardly the type of voluntary repayment made out of a sense of moral obligation that Congress envisioned when it

into the "voluntariness" of a reaffirmation agreement that does not conform to § 524(c) and (d) has been recognized by Judge Arnold in *VanMeter*.

> This court is not inclined to believe that it was the intention of Congress to plunge the courts into this kind of miasma when it used the word 'voluntary.' What Congress seemingly wished to do when it enacted § 524(c) and 524(d) was to forestall all inquiries about the voluntariness of discharge agreements with creditors by narrowly and rigidly defining what kinds of agreements were valid. This means that it chose, in this court's view, to make void all post-discharge agreements. There is no reason to believe that the addition . . . of § 524(f) was intended to undo that previous decision.

*Id.* at 34. Decisions which have held post discharge agreements by debtors to be enforceable have all been founded on circumstances substantially different from the instant matter. *See Watson v. Shandell (In re Watson)*, 192 B.R. 739, 747 (9th Cir. BAP 1996), *aff'd*, 116 F.3d 488, 1997 WL 330895 (9th Cir.1997) (unpublished table decision) (post discharge execution of promissory note to prevent foreclosure on collateral did not violate discharge injunction); *In re Petersen*, 110 B.R. at 950 ("Where, as here, an informed Chapter 7 debtor elects, post-petition, to adopt and continue a pre-petition lease agreement rejected by the trustee, and there is legally sufficient post-petition consideration between the parties, then the lease will be deemed a binding, enforceable post-petition obligation of the debtor"); *Antonino v. Kenny (In re Antonino)*, 241 B.R. 883, 888 (Bankr.N.D.Ill.1999) (chapter 7 debtor's obligation to pay former wife's attorney fees arose from new post-discharge

agreement); *Bryer v. Hetrick (In re Bryer)*, 216 B.R. 755, 759 (Bankr.E.D.Pa. 1998) (obligation of wife to former husband for gratuitous mortgage payments made on house occupied by debtors after wife's Chapter 7 discharge was post-petition debt not previously discharged); *Minster State Bank v. Heirholzer (In re Heirholzer)*, 170 B.R. 938, 941 (Bankr.N.D.Ohio 1994) (execution post discharge of a new promissory note in consideration of bank agreeing not to foreclose mortgage is new and sufficient consideration to support a binding post-discharge obligation); *Hudson v. Central Bank (In re Hudson)*, 168 B.R. 368, 371 (Bankr.S.D.Ill.1994) (payments made by debtors post discharge with no action to collect debt by creditor are not refundable because payments were made with mistaken belief by debtors they were still obligated on indebtedness); *Button v. Sheridan Oil Co. (In re Button)*, 18 B.R. 171, 172 (Bankr.W.D.N.Y.1982) (new post discharge note made to beneficiary of nondischargeable restitution payments to avoid incarceration constituted a new debt supported by the consideration of substitution of a civil enforcement mechanism for criminal process). *But see Liptz & Roberts, Chartered Pension Plan Trust v. Stevens (In re Stevens)*, 217 B.R. 757, 759 (Bankr.D.Md. 1998) ("This court does not find the analyses in these cases [*Petersen, Watson, Heirholzer* and *Button*] to be instructive or persuasive primarily because the cases focus only on the existence of new consideration rather than whether the former discharged obligation constituted any part of the consideration").

■ The instant case in no manner resembles the circumstances of any of these decisions where non-conforming post discharge agreements were found to be enforceable.[12] Here, it is undisputed that

---

adopted § 524(f).") But see *In re Petersen*, 110 B.R. 946, 950 (Bkrtcy.D.Colo.1990) (where debtor was a sophisticated businessman, voluntarily entering into reaffirmation agreement, protections of § 524 did not apply because § 524 intended to protect creditor who

unwittingly or involuntarily enters into a reaffirmation agreement).

12. This is not intended to imply this court would follow the reasoning of the courts in *In re Peterson, et al.*,under similar factual circumstances, which reasoning, as Judge Keir

there was no new consideration extended to Cherry at the time of execution of the Replacement Notes. These new obligations admittedly consisted solely of the unpaid principal and interest under the Original Notes. There is likewise no argument that there was any forebearance on the part of Arendall as the Replacement Notes remained payable on demand. The Replacement Notes were not "payment" of the Original Notes; rather, they are nothing more than Cherry's reaffirmation of the obligation was voided by this Court's granting of Cherry's discharge. Regardless of how non-coercive or voluntary the circumstances of Cherry's execution of the Replacement Notes, the admitted failure to adhere to the requirements of § 524(c) and (d) of the Bankruptcy Code destroys the validity and enforceability of these instruments. Accordingly, this Court holds the Replacement Notes are void and of no legal force and effect and, having so found, Arendall's Counterclaim is dismissed with prejudice.

## II. Sanctions for Violation of 11 U.S.C. § 524(a)(2)

 Cherry has prayed that this Court find Arendall in contempt for violation of the discharge injunction contained in 11 U.S.C. § 524(a)(2) and to award him compensatory and punitive charges.[13] Generally, the "American Rule" governs the awarding of attorney's fees in federal courts. See *Watkins v. Guardian Loan Co. (In re Watkins)*, 240 B.R. 668, 678 (Bankr.E.D.N.Y.1999) (citing *Walker v. M & M Dodge, Inc. (In re Walker)*, 180 B.R. 834, 849 (Bankr.W.D.La.1995); *In re Brantley*, 116 B.R. at 443). The "American Rule" provides that each party should bear the cost of its litigation and, ordinarily, the prevailing litigant is not entitled to collect the reasonable attorney's fees from the loser. See *Id.* (citing *Alyeska Pipeline Service Co. v. Wilderness Society*, 421 U.S. 240, 247, 95 S.Ct. 1612, 44 L.Ed.2d 141 (1975)). Congressional authorization by statute may except the American Rule and permit a court to require one party to pay attorney's fees to the other. *See Pennsylvania v. Delaware Valley Citizens Council for Clean Air*, 478 U.S. 546, 561–62, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). A court's authority to enforce its own orders by assessing attorney's fees for the willful violation of a court order and a court's empowerment to award fees against a losing party who has acted in bad faith, vexatiously, wantonly, or for oppressive reasons are other exceptions to the American Rule. *Id.* at 562 n. 6, 106 S.Ct. 3088 (citing *Alyeska*, 421 U.S. at 258–259, 95 S.Ct. 1612).[14] There is no express statutory provision for the payment of attorney's fees or damages for the violation of the § 524 injunction. See *In re Brantley*, 116 B.R. at 449.

 11 U.S.C. § 105(a) authorizes a bankruptcy court to hold a party in civil contempt for failing to comply with a pre-

in *In re Stevens* has suggested, focuses on the issue of whether new consideration exists in contradiction of the express statutory language of 11 U.S.C. § 524(c) addressing obligations consisting "in whole or in part" of discharged indebtedness.

13. 11 U.S.C. § 524(a)(2) renders, in relevant part:
 (a) A discharge in a case under this title—
 (2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived.

11 U.S.C.A. § 524(a)(2) (1999).

14. An example of an express statutory authorization for a bankruptcy court to award attorney's fees to a party is found at 11 U.S.C. § 362(h) which provides:

 "An individual injured by any wilful violation of a stay provided by this section [362] shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances may recover punitive damages."
 11 U.S.C.A. § 362(h) (1999).

vious order.[15] *See Burd v. Walters (In re Walters)*, 868 F.2d 665 (4th Cir.1989). The discharge injunction put in place pursuant to 11 U.S.C. § 524(a) is an order of the Bankruptcy Court whose violation is punishable by the imposition of civil sanctions. *See In re Stevens*, 217 B.R. at 762; *Bessette v. Avco Financial Services, Inc.*, 240 B.R. 147, 154 (D.R.I.1999) (citing *Cox v. Zale Delaware, Inc.*, No. 97 C 4464, 1998 WL 397841 at *3 (N.D.Ill. July 13, 1998); *In re Watkins*, 240 B.R. at 678.) These sanctions may include actual damages, attorney's fees and, when appropriate, punitive damages. *See Mickens v. Waynesboro Dupont Employees Credit Union, Inc. (In re Mickens)*, 229 B.R. 114, 118 (Bankr.W.D.Va.1999) *Vazquez v. Sears, Roebuck & Co. (In re Vazquez)*, 221 B.R. 222, 228–29 (Bankr.N.D.Ill.1998); *Matter of Arnold*, 206 B.R. 560, 568 (Bankr. N.D.Ala.1997); *In re Walker*, 180 B.R. at 847–49;. Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes: to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained. *See United States v. United Mine Workers*, 330 U.S. 258, 303, 67 S.Ct. 677, 91 L.Ed. 884 (1947). The measure of the court's power in civil contempt proceedings is determined by the requirements of full remedial relief. *See McComb v. Jacksonville Paper Co.*, 336 U.S. 187, 193, 69 S.Ct. 497, 93 L.Ed. 599 (1949). Thus, this Court may assess attorney's fees if Arendall's violation of the discharge injunction was willful.

The Fourth Circuit Court of Appeals has not heretofore addressed what constitutes a "willful" violation of the discharge injunction pursuant to § 524. The Eleventh Circuit Court of Appeals has considered the appropriate standard to apply to conclude a violation of the § 524 injunction was willful, reasoning that "the focus of the court's inquiry in civil contempt proceed-

ings is not on the subjective beliefs or intent of the alleged contemnors in complying with the order, but whether in fact their conduct complied with the order at issue." *In re Hardy*, 97 F.3d at 1390 (quoting *Howard Johnson Co. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir.1990)). The court in that case analogized to the test that it had previously adopted to determine willfulness in violating the automatic stay provision of § 362 in *Jove Eng'g, Inc. v. I.R.S. (In re Jove Eng'g, Inc.)*, 92 F.3d 1539 (11th Cir.1996). There the court concluded that the defendant would be found in contempt if it: "(1) knew that the automatic stay was involved and (2) intended the actions which violated the stay." *In re Hardy*, 97 F.3d at 1390 (quoting *In re Jove Eng'g*, 92 F.3d at 1555). The court found such a measure appropriate in the context of a § 524 proceeding, writing "[t]his test is likewise applicable to determining willfulness for violations of the discharge injunction of § 524." *In re Hardy*, 97 F.3d at 1390.

■■■■ The Court agrees with the holding in *Hardy* that the standard used for determining whether a stay violation was willful pursuant to § 362 may be used to determine whether a violation of the discharge violation was willful. In a civil contempt proceeding, the state of mind with which the contemnor violated a court order is irrelevant and therefore good faith, or the absence of an intent to violate the order, is no defense. *See McComb*, 336 U.S. at 191, 69 S.Ct. 497. As a result, it is consistent to apply the precedents of the Fourth Circuit Court of Appeals concerning the determination of willfulness of a creditor's conduct in an automatic stay violation to measure the culpability of Arendall's conduct in his violation of the discharge injunction in the instant case.

■■■ The Fourth Circuit Court of Appeals has considered the necessary eviden-

---

**15.** 11 U.S.C. § 105(a) provides in pertinent part that "[t]he court may issue any order, process or judgment that is necessary or ap-

propriate to carry out the provisions of this title." 11 U.S.C.A. § 105(a) (1999).

tiary showing to establish a willful violation of the automatic stay, holding that "to constitute a willful act, the creditor need not act with specific intent but must only commit an intentional act with knowledge of the automatic stay." *Citizens Bank v. Strumpf (In re Strumpf)*, 37 F.3d 155, 159 (4th Cir.1994), *rev'd on other grounds*, 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995) (citing *Budget Service Co. v. Better Homes*, 804 F.2d 289, 292–93 (4th Cir. 1986)); *Cuffee v. Atlantic Bus. & Community Dev. Corp. (In re Atl. Bus. & Community Corp.)*, 901 F.2d 325, 329 (3rd Cir.1990).[16] In *Better Homes*, the court stated that the conduct of a creditor in violating the stay is willful when "[t]here is ample evidence in the record to support the conclusion that [the creditor] knew of the pending petition and intentionally attempted to [continue collection procedures] in spite of it." *Better Homes*, 804 F.2d at 292–293. Accordingly, in order for conduct to be willful, it must be intentional or deliberate. *See Hamrick v. United States (In re Hamrick)*, 175 B.R. 890, 892 (W.D.N.C.1994) (citing *In re Shealy*, 90 B.R. 176, 179 (Bankr.W.D.N.C.1988)). Courts, accordingly, have contrasted "willful" conduct by creditors with violations which were "inadvertent" and where no injury occurs. See *Id.* at 893.[17] Thus, this

Court must determine whether the violation of the discharge injunction pursuant to § 524 was intentional or deliberate so as to expose Arendall to an award of sanctions.

█ Applying these lessons, there appears to be no question that Arendall's violation of the discharge injunction here was willful, deliberate and with his knowledge of the issuance of the discharge order in this case.[18] The evidence is undisputed that Cherry's indebtedness to Arendall was properly listed in Cherry's bankruptcy schedules, and that Arendall was aware of Cherry's bankruptcy filing and the issuance of the discharge order in this case.

█ Mitigating Arendall's undisputed knowledge is the fact that, at the time Cherry made the Replacement Notes, Arendall was not represented by counsel. However, Arendall chose not to consult with any professional who might be knowledgeable of the requirements of § 523(c) and (d) concerning reaffirmation agreements. While it is understandable that a lay person such as Arendall would not be knowledgeable on these reaffirmation requirements, what is less excusable is Arendall's failure to obtain any legal advice during the several years after the making

**16.** The Second. Third and Ninth Circuits have adopted a similar standard for assessing whether or not a violation of the automatic stay is willful. See *In re Atl. Business & Community Corp.*, 901 F.2d at 329; *Crysen Montenay Energy Co. v. Esselen Assoc., Inc. (In re Crysen Montenay Energy Co.)*, 902 F.2d 1098, 1105 (2nd Cir.1990); *Goichman v. Bloom (In re Bloom)*, 875 F.2d 224, 227 (9th Cir.1989).

**17.** Courts in considering whether violations of the automatic stay pursuant to 11 U.S.C. § 362(h) have specifically rejected "good faith" defenses, finding that "[n]ot even a 'good faith' mistake of law or a 'legitimate dispute' as to legal rights relieve a willful violator of the consequences of the act" or a "good faith reliance on an attorney's advice." *In re Daniels*, 206 B.R. 444, 446 (Bankr. E.D.Mich.1997) (citing *Maritime Asbestosis Legal Clinic v. LTV Steel Co. (In re Chateaugay Corp.)*, 112 B.R. 526, 530 (S.D.N.Y.1990),

*rev'd on other grounds*, 920 F.2d 183 (2nd Cir.1990)). Some cases specifically have found a creditor's violation of the stay may be willful even if the creditor believed in good faith that it was justified in taking the action found to be violative of the stay. *See Cox v. Billy Pounds Motors, Inc. (In re Cox)*, 214 B.R. 635, 641 (Bankr.N.D.Ala.1997) (citations omitted).

**18.** The Eleventh Circuit Court of Appeals has held that the willfulness of the violation must be proved by clear and convincing evidence. See *In re Arnold*, 206 B.R. at 567, citing *Jove Eng'g*, 92 F.3d at 1545. There is no suggestion in the caselaw that the Fourth Circuit Court of Appeals would require such a measure of proof (as opposed to the usual measure of a preponderance of the evidence). However, even if this higher standard were to be applicable, the proof of willfulness here is satisfactory.

of the Replacement Notes. Even more culpable is the fact that Arendall chose to continue prosecution of his action to enforce the Replacement Notes by filing the Motion for Judgment after he retained counsel. Arendall continued to prosecute the judgment even after Arendall's counsel received a letter from Cherry's counsel outlining, in detail, including citation to the decision in *In re Mickens*. Cherry's position that continued enforcement of the Replacement Notes was a violation of the discharge injunction and would result in the initiation of the instant contempt proceeding.[19] The prosecution directly resulted in this intensely litigated proceeding.[20]

■ Cherry's undisputed testimony is that he has incurred $6,000.00 in attorney's fees in the defense of the State Court proceeding and in the course of the instant proceeding for contempt. Cherry proffered no other evidence of compensable harm.[21] An award of the attorney's fees Cherry incurred, both in the defense of the Motion for Judgment and in the prosecution of the instant contempt proceeding, is merely to compensate Cherry for the actual damages Arendall's contempt of the discharge order incurred.[22]

## Punitive Damages

■ A majority of courts allow punitive damages for violation of the discharge injunction. *See Matter of Arnold,* 206 B.R. at 566.[23] Only one court of the

19. While not specifically asserted as a defense, any reliance by Arendall on the advice of counsel does not constitute a defense to civil contempt. As the Fourth Circuit Court of Appeals has written:

> Advice of counsel may be a defense in a criminal contempt proceeding because it negates the element of willfulness. But, since lack of willfulness is not a defense in a proceeding for civil contempt as McComb holds, its negation is not a defense to the action. This case, rather, falls under the rule of *Link v. Wabash R.R. Co.*, 370 U.S. 626, 633–634, 82 S.Ct. 1386, 1390–1391, 8 L.Ed.2d 734 (1962), to the effect that one cannot voluntarily choose an attorney and then avoid the consequences of the attorney's acts or omissions. (internal citations omitted)

*In re Walters,* 868 F.2d at 668.

20. The prime intent of the discharge injunction is to give the debtor a fresh start. This intent requires the burden of ascertaining whether a debt is discharged to fall on the creditor. As has been aptly observed in the context of violations of the automatic stay, "[i]f the creditor is uncertain about the scope of the automatic stay, he takes the risk of being assessed for damages if he fails to obtain clarification from the bankruptcy court." *In re Peterkin,* 102 B.R. 50, 53–54 (Bankr. E.D.N.C.1989) (quoting *Summerlin v. Outlaw (In re Outlaw),* 66 B.R. 413, 419 (Bankr. E.D.N.C.1986)). Here, Arendall chose not to reopen Cherry's case to seek a determination as to whether the Replacement Notes were enforceable, but instead proceeded to attempted enforcement.

21. Although Cherry offered no evidence of the actual damages he incurred except for attor-

ney's fees, an award of damages for emotional distress occasioned by a civil contempt violation has been disallowed by the Fourth Circuit Court of Appeals. *In re Walters,* 868 F.2d at 670. In that case, the court did allow an award of attorney's fees. *Id.*

22. At least two courts of the Fourth Circuit have awarded attorney's fees as an element of damage for violation of the discharge injunction. *See, e.g., In re Barbour,* 77 B.R. 530, 531–32 (Bankr.E.D.N.C.1987); and *In re Thomas,* 184 B.R. 237, 240 (Bankr.M.D.N.C. 1995). A case which declined to award attorney's fees where a discharge violation was found is *In re Brantley,* 116 B.R. 443 (Bankr. D.Md.1990), where the complaint was filed by a Chapter 7 debtor to recover monies collected from her on a discharged note. There it was determined the evidence showed "no bad faith, vexatious or wanton actions, or oppressive motivations" to justify an attorney's fees award. *Id.* at 448. The evidence also failed to show the creditor acted with actual knowledge of the wording of the discharge order. Perhaps most importantly, the court recognized the cases permitting an award of attorney's fees for violations of the discharge injunction but noted that the "[d]ebtor did not bring this compliant as an action for contempt, and it was not presented to this Court as a contempt proceeding" and the failure to observe the notice and hearings requirements of Bankruptcy Rule 9020 made an award of attorney's fees inappropriate. *Id.* at 450.

23. The reasoning and the measure permitting such an award has differed: *See, e.g., In re Walker,* 180 B.R. at 847. (attorney acted "willfully and in clear disregard of the bankruptcy

Fourth Circuit, however, appears to have considered whether an award of punitive damages was appropriate in a discharge violation. In *In re Brantley*, 116 B.R. at 449, punitive damages were denied because of the absence of proof of actual knowledge of the bankruptcy case prior to the actions complained of by the debtor and, while the court there concluded the actions of one of the creditor defendants was deliberate, there was no showing of any "malevolent intent" on the part of the creditor. *Id.* In considering whether punitive damages are appropriate under the statutory authorization for an automatic stay violation under 11 U.S.C. § 362(h),[24] courts have generally required a violation which occurs by way of egregious or vindictive conduct. See *In re Carrigan*, 109 B.R. 167, 172 (Bankr.W.D.N.C.1989) (citing *In re Midkiff*, 85 B.R. 467 (Bankr. S.D.Ohio 1988)). Accordingly, whether expressed as "egregious conduct," "malevolent intent," or "clear disregard of the bankruptcy laws," each of these decisions appear to employ a finding of creditor conduct beyond willfulness or deliberation and more closely resembling a specific intent to violate the discharge injunction in order to assess punitive damages.

 The application of these ideas to the instant matter renders it inappropriate to award punitive damages against Arendall. As noted *supra*, while the willfulness of the violation of the discharge injunction here is self-evident, the evidence does not suggest Arendall's conduct was egregious or motivated by any malevolent intent. Rather, Arendall proceeded to attempt to collect the indebtedness that the Replacement Notes represented initially without obtaining the benefit of advice concerning the reaffirmation requirements of § 524(c) and (d) and, thereafter, after legal counsel apparently advised that he could sue to enforce these void obligations.

Other considerations weigh against assessment of punitive damages here. Arendall is not an institutional creditor who repeatedly seeks and procures reaffirmation agreements from multiple debtors. This creditor is unlikely to repeat this unfortunate instance involving Cherry, and it is probable that Arendall will never be confronted with a reaffirmation opportunity as was presented here. While no evidence of Arendall's ability to pay damages was proffered at trial, this Court can readily surmise that the voiding of the indebtedness the Replacement Notes represent, combined with the award of $6,000.00 in attorney's fees to Cherry, is a substantial financial burden to Arendall. The imposition of additional monetary sanctions against Arendall is not necessary to fairly compensate Cherry for his only proven damages of attorney's fees and cannot reasonably be reckoned as contributing to any future deference of conduct on Arendall's part. Accordingly, Cherry's

law"); *Owen v. Treadway (In re Owen)*, 169 B.R. 261, 262 (Bankr.D.Me.1994) (debtor must demonstrate "malevolent intent in violating § 524); *Matter of Arnold*, 206 B.R. at 567 (creditor acted willfully in clear disregard and disrespect of the bankruptcy laws with malicious intent"); *In re Vazquez*, 221 B.R. at 230 (citing *Nigro v. Oxford Dev. Co. (In re M.J. Shoearama, Inc.)*, 137 B.R. 182, 190 (Bankr. W.D.Pa.1992)) (relevant factors to be considered for violations of the discharge injunction are the nature of the creditor's conduct, the creditor's ability to pay damages, the motive of the creditor and any provocation by the debtor). The Eleventh Circuit Court of Appeals appears to have limited the ability to award punitive damages in the instance of a discharge violation, holding that only coercive, non-punitive sanctions are appropriate for contempt, which are determined by the inquiry of whether the award directly serves the complainant rather than the public interest and whether the contemnor may control the extent of the award. *In re Hardy*, 97 F.3d at 1390 (citing *In re Jove Eng'g*, 92 F.3d at 1557–58). But see *Matter of Arnold*, 206 B.R. at 567 (*Hardy* is distinguishable because award of sanctions against federal government limited by sovereign immunity waiver under 11 U.S.C. § 106 which excludes punitive damages from monetary damage recovery).

24. 11 U.S.C. § 362(h) provides for an award of "punitive damages, if appropriate." 11 U.S.C.A. § 362(h) (1999).

prayer for an award of punitive damages is denied.

For all of the foregoing reasons, this Court believes an award of attorney's fees to Cherry from Arendall in the amount of $6,000.00 justly compensates Cherry for the willful violation of the discharge injunction pursuant to 11 U.S.C. § 524(a).

### Conclusion

1. Jurisdiction in this adversary proceeding is conferred upon this Court pursuant to 28 U.S.C. § 157, 11 U.S.C. §§ 105 and 524 and 28 U.S.C. § 1334.

2. This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and (O) and 28 U.S.C. § 1334.

3. The Replacement Notes are invalid in that the requirements of 11 U.S.C. § 524(c) and (d) were not complied with and do not constitute voluntary repayments pursuant to 11 U.S.C. § 524(f), and, as such, are void and unenforceable.

4. Arendall wilfully violated the discharge injunction pursuant to 11 U.S.C. § 524 by his attempted enforcement of the Replacement Notes against Cherry.

5. By reason of the holding, the Replacement Notes are void and not enforceable, and the Counterclaim of Arendall against Cherry is dismissed with prejudice. Likewise, the Original Notes are void and unenforceable because they were appropriately discharged in Cherry's bankruptcy.

6. As compensation for actual damages sustained by Cherry by reason of the willful violation of the discharge injunction pursuant to 11 U.S.C. § 524, it is ORDERED that Cherry is awarded attorney's fees in the amount of $6,000.00, and it is further ORDERED that this sum shall be payable by Arendall to Cherry no later than sixty (60) days after the entry of this Memorandum Opinion and Order.

It is further ORDERED that the Clerk shall forward a copy of this Memorandum Opinion and Order to Carl E. Eason, Jr., counsel for Cherry; and to Joseph W. Kaestner, counsel for Arendall.