**In re William Powell JONES, Debtor.**

**No. 01–80412–SSM.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

April 17, 2007.

---

J. Bradley Reaves, Kaufman & Canoles, P.C., Norfolk, VA, for Justice Federal Credit Union.

## MEMORANDUM OPINION AND ORDER DENYING MOTION TO REOPEN

STEPHEN S. MITCHELL, Bankruptcy Judge.

Before the court is the debtor's motion to reopen his closed case in order to seek sanctions against Justice Federal Credit Union ("Justice FCU" or "the credit union") for violation of the discharge injunction by reporting a discharged debt to a credit reporting agency as "charged off." A hearing on the motion was held on March 27, 2007, with both the debtor and the credit union being represented by counsel. Following the hearing, the debtor and the credit union each submitted memoranda of law which the court has considered. For the reasons stated, the motion to reopen will be denied.

### Background

William Powell Jones ("the debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code in this court on April 3, 2001. Among the creditors listed on his schedules was Justice FCU, which was shown as being owed $3,057.70. The debtor was granted a discharge on July 19, 2001. The trustee having filed a report of no distribution in the interim, the case was closed on July 23, 2001. In 2005, the case was reopened on the debtor's motion to resolve a claim that MBNA Bank had violated the discharge injunction. The court set an evidentiary hearing, but subsequently dismissed the matter after the debtor and the creditor reached a settlement. The case was closed a second time on November 16, 2006.

The present motion to reopen was filed on February 1, 2007, approximately a

Robert R. Weed, Law Offices of Robert Weed, Manassas, VA, for Debtor.

month and a half later. The motion requests that the case be reopened to allow the debtor to file an adversary proceeding to hold Justice FCU in contempt for violation of the discharge injunction. The proposed complaint attached to the motion alleges that Justice FCU engaged in an act to collect the discharged debt by reporting it to one of the three major credit reporting agencies, Experian, in January 2007, showing a balance of $3,238 and a status of "Account charged off/Never late. $3,243 written off." The complaint further alleges that an industry standard known as METRO2 requires that debts discharged in bankruptcy be reported with a zero balance as "Included in Bankruptcy" or "Discharged in Bankruptcy," and that Justice FCU's reporting of the debt instead as "written off" was done to pressure the debtor into paying the debt, as future credit grantors would require payment of non-discharged delinquent debts as a condition of making loans or extending credit.

At the hearing on the motion to reopen, Justice FCU's presented the testimony of Ms. Kathy Dalfrey, its vice president of finance and lending. She testified that Justice FCU currently uses the METRO (not METRO2) reporting system, and that it reports only to Equifax and Experian. The witness explained that METRO has a limited range of reporting codes compared with METRO2, which was promulgated in the late 1990s. Justice FCU uses the same codes to report the status of a member's account to Equifax and Experian. When a member files for bankruptcy, the account is reported using a two-code sequence, the first indicating that the loan account is "charged off," and the second indicating that the member is or was in bankruptcy. Justice FCU also adds its own comment to indicate whether the bankruptcy was a chapter 7 or chapter 13 case. For reasons that are unexplained, the bankruptcy notation appears as part of the reported loan status on the Equifax reports, while on the Experian reports it does not. Ms. Dalfrey testified that Justice FCU was unaware of this problem because, while it reports to both Experian and Equifax, it pulls reports only from Equifax. She further testified that the credit union has no reason to pull reports from Experian and only learned of the reporting error on the Experian credit report when the debtor's motion to reopen was filed. Prior to the filing of the motion to reopen, Justice FCU had not received any communication from the debtor or his attorney about the debtor's account. According to Ms. Dalfrey, the error on the Experian report has now been corrected, with the report currently showing a zero balance owed to Justice FCU and that the debtor was in a chapter 7 bankruptcy case. She further testified that in addition to correcting the debtor's account, Justice FCU has been working with both Experian and Equifax to ensure that necessary corrections are made to the bankruptcy reporting procedures. Finally, Justice FCU plans to migrate to the METRO2 reporting system by the end of 2007.

On cross-examination, Ms. Dalfrey explained that a "charge off" report is used when a credit union has to write off bad debt for accounting purposes and does not mean that the loan has been forgiven; rather, the balance remains on the member's account. She conceded that a "charge off" report negatively impacts a member's credit score, and that Justice FCU itself is reluctant to extend credit to someone with a "charged off" account on their credit report. Ms. Dalfrey asserted that, prior to this case, Justice FCU— which has been reporting credit history to Experian for six years or more—had not been aware of any reporting problems with Experian. She further testified that she was not personally aware of any Fair Credit Reporting Act complaints made by its members related to discharged debts.

Justice FCU uses a system called e-Oscar to gather information on disputed account reports, but the system only reports information for the preceding 120 days, making it difficult to tell if there were any credit reporting disputes within the past six years related to discharged debts.[1] Finally, the witness testified that, to her knowledge, Justice FCU has never demanded that a "charged off" loan be paid before extending credit to a member, nor would Justice FCU accept a payment against a debt from a member who was in bankruptcy without first consulting with its attorney.

*Discussion*

I.

A bankruptcy case may be reopened for, among other reasons, to accord relief to the debtor. § 350(b), Bankruptcy Code. Whether a bankruptcy case should be opened is left to the sound discretion of the bankruptcy court and depends on the circumstances of the case. *Hawkins v. Landmark Fin. Co.*, 727 F.2d 324, 326 (4th Cir.1984). In considering a motion to reopen, the court should generally avoid ruling on the merits of the underlying matter to be considered, thereby forcing the debtor to prove his case twice. *In re Potes*, 336 B.R. 731, 732–33 (Bankr.E.D.Va.2005). However, a court should refrain from opening a closed case where there is no relief to be accorded the debtor. *In re Carberry*, 186 B.R. 401, 402 (Bankr. E.D.Va.1995) (ruling that case would not be reopened to add omitted creditor, since merely scheduling the debt would not affect its dischargeability); *see also Thompson v. Commonwealth of Va. (In re Thompson)*, 16 F.3d 576 (4th Cir.1994) (holding that reopening debtor's chapter 7 case to add a debt for unpaid court costs from a criminal conviction in state court would accord no relief because the debt was nondischargeable).

II.

The discharge of a debt in bankruptcy operates as an injunction against, among other activities, any "act … to collect, recover or offset any such debt as a personal liability of the debtor[.]" § 524(a)(2), Bankruptcy Code. While no personal right of action for violation of the discharge injunction is available, a bankruptcy court may address a violation under its civil contempt powers. *Cherry v. Arendall (In re Cherry)*, 247 B.R. 176, 186–87 (Bankr.E.D.Va.2000).

The debtor's position is that a "charge off" entry on a credit report is an act done with the intention of notifying others in the credit reporting industry that the debtor is less credit worthy and to lower his credit score. The debtor argues that good faith and the absence of an intent to violate the discharge injunction is irrelevant, and that a creditor does not have to act with the specific intent to violate the discharge injunction. *Cherry v. Arendall (In re Cherry)*, 247 B.R. 176, 187 (Bankr.E.D.Va. 2000). Rather, the creditor only has to commit an intentional act with knowledge of the discharge injunction. *Citizens Bank of Maryland v. Strumpf (In re Strumpf)*, 37 F.3d 155, 159 (4th Cir.1994) (holding that bank's act of placing an administrative hold on debtor's account before obtaining relief from stay was a violation of the automatic stay), *rev'd* 516 U.S. 16, 116 S.Ct. 286, 133 L.Ed.2d 258 (1995).

Justice FCU, by contrast, argues that intent, or the lack of it, is central to the analysis of whether the discharge injunction has been violated. Its position, in a nutshell, is that there was no intent here to pressure the debtor into paying the discharged debt, and hence no violation of the discharge injunction. According to its witness, Justice FCU was sending the same information to both Experian and

---

**1.** For more information about the e-Oscar system, see http://www.e-oscar.org (2006).

Equifax and was unaware of Experian's mistaken reporting. Additionally, since the erroneous reporting has been fixed, there is no meaningful relief that can be accorded the debtor. Finally, Justice FCU argues that the debtor failed to comply with the notice requirements of the Fair Credit Reporting Act, 15 U.S.C. § 1681 *et seq.* The first notice that Justice FCU had of the incorrect credit report was from the proposed complaint attached to the motion to reopen. Justice FCU argues that because the FCRA does not impose liability for an initial mistake, allowing the debtor to make an "end run" around the notice requirements by framing the issue as a discharge violation is inappropriate.[2]

## III.

For an individual, the discharge is unquestionably the heart and soul of the "fresh start" that Congress intended to provide the poor but honest debtor in bankruptcy. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934) (explaining that a bankruptcy discharge "gives to the honest but unfortunate debtor who surrenders for distribution the property which he owns at the time of bankruptcy, a new opportunity in life and a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt."). Because of the central role played by the discharge, reopening a closed case to redress a

claimed violation of the discharge injunction is almost routinely granted. Put another way, a motion to reopen would typically only be denied if it were clear that the discharge injunction had not been violated, either because the debt in question was nondischargeable or because the action complained of would not have constituted a violation, or, if there had been a violation, it was minor or unintentional, and had been cured.

In this connection, Justice FCU calls attention to Judge Mayer's ruling in *Helmes v. Wachovia Bank, N.A. (In re Helmes),* 336 B.R. 105 (Bankr.E.D.Va. 2005), and asserts that under the evidence it has presented, the debtor can make no showing that Justice FCU violated the discharge injunction. In *Helmes,* the discharged chapter 7 debtor sought to have her case reopened in order to file a complaint against Wachovia Bank for violating the discharge injunction when it reported her account to a credit reporting agency as "Over 120 days Past Due" with a balance of $11,714. *Helmes,* 336 B.R. at 107. After the debtor complained, Wachovia amended the notation on her credit report to read "Discharged in bankruptcy" with a zero balance. *Id.* Wachovia argued that the reporting of the debt as past due was accidental and not willful. *Id.* at 108.

The court in *Helmes* explained that, to violate the discharge injunction, the act

**2.** The fact that a particular action may violate a consumer protection statute in addition to the discharge injunction does not, in the court's view, detract from the propriety of enforcing the discharge injunction. The court thus gives no weight to the "end run" argument. The court does note, however, that several reported opinions stand for the proposition that where the only damages that a debtor can establish as a result of violation of the automatic stay or discharge injunction are the attorney fees incurred in bringing the contempt motion, the debtor will be entitled to such fees only if some attempt was made to

resolve the dispute with the creditor prior to filing the contempt motion. *Shadduck v. Rodolakis,* 221 B.R. 573, 585 (D.Mass.1998); *In re Craine,* 206 B.R. 594, 598 (Bankr.M.D.Fla. 1997); *In re Brock Utilities & Grading, Inc.,* 185 B.R. 719, 720–21 (Bankr.E.D.N.C.1995); *see also In re Roush,* 88 B.R. 163, 165 (Bankr. S.D.Ohio 1988) (stating that debtor's counsel should first communicate with offending creditor but preserving debtor's right, even if creditor immediately ceased collection activity, to seek award of fees sufficient to compensate for the communication and fee application).

must be intentional. "An unwitting or unintentional act does not violate the discharge stay. The intent necessary in a § 524(a)(2) action is the same as in a § 362(a) action." *Id.* at 109 (explaining that the Fourth Circuit has held that a creditor violates the automatic stay when there is enough evidence to support the conclusion that the creditor knew of the pending bankruptcy petition and intentionally attempted to collect on the debt in spite of the automatic stay (quoting *Budget Serv. Co. v. Better Homes*, 804 F.2d 289 (4th Cir.1986))). The debtor in *Helmes* failed to show that submitting the incorrect report to the credit agency or permitting it to remain on the debtor's credit report was an intentional act by Wachovia to collect the debt. *Id.* The court explained that the debtor had erroneously assumed that the only reason for a creditor to incorrectly report the debt is to collect on the debt. *Id.* Wachovia demonstrated that there was another reason for the disparaging credit report—it was a mistake. *Id.* The bank made no effort to collect on the debt, it did not refuse to correct the mistake once it was brought to its attention, nor was there evidence that the error was repeatedly made in other bankruptcy cases. *Id.* Furthermore, the debtor failed to prove any damages. "Damages must flow from the violation of the [discharge] injunction." *Id.* While the debtor testified that she paid higher rates for automobile loans and was turned down for other loans, the evidence did not show that she would have obtained loans at lower interest rates or would have been approved in the first place were it not for the mistaken credit report. *Id.*

Similarly, the debtor here has failed to offer anything more than mere speculation that Justice FCU, by reporting a discharged debt to Experian, did so for the purpose of collecting on the debt. It is true that courts have frequently held that acts which by their nature constitute efforts to collect discharged debts—such as filing suit against the debtor, sending dunning notices, or attaching the debtor's property—are not excused simply because they were mistakenly pursued. See *In re Roush*, 88 B.R. 163 (Bankr.S.D.Ohio 1988) (finding that bank's failure to maintain adequate procedures to prevent sending of dunning letter constituted willful violation of discharge injunction, even though bank's attorney took no further action to collect the debt after debtor advised him it had been discharged); *In re Solis*, 137 B.R. 121, 131 (Bankr.S.D.N.Y.1992) (holding the IRS in willful violation of the automatic stay for levying on debtor's bank account even though the violation was due to a computer error). *In re Shealy*, 90 B.R. 176 (Bankr.W.D.N.C.1988) (holding that state tax commission's computer-generated threat letters constituted willful violation of the automatic stay when no adequate steps had been taken to prevent them from being sent). However, a distinction must be made between acts which have as their direct and natural purpose the collection of debts and acts which have some other lawful purpose but could also be used (or, more accurately, misused) to coerce payment of a debt. The reporting of a delinquent debt to a credit reporting agency is not inherently an act to collect a debt but rather to share information relevant to credit granting decisions. A creditor reports both performing and delinquent accounts in the expectation that other credit grantors will do the same, enhancing each creditor's ability to evaluate proposed credit transactions and to avoid extending credit or making loans to poor credit risks.

■ This is not to say that the reporting of a discharged debt as delinquent rather than discharged would not, at least in some circumstances, place pressure on a debtor to pay the debt. And the court

does not doubt that there are at least some creditors who report discharged debts without an indication of their bankruptcy status in the hope that debtors will be pressured into paying them as a condition of obtaining future credit.[3] But where the action complained of does not on its face constitute an act to collect a debt, the burden is on the debtor to show that the creditor took the challenged action for the specific purpose of collecting a discharged debt.

As *Helmes* indicates, the creditor must do more than commit an intentional act with knowledge of the discharge injunction. In this case, the evidence would at most support a finding of failure to take appropriate care in verifying the reporting of the discharged debt. Whether such negligence would support a cause of action under the FCRA is not before the court, as the debtor does not assert an FCRA claim. Where failure to have adequate controls in place results in an action (such as a dunning letter or filing suit) that is specifically directed at payment of a debt, a willful violation of the discharge injunction may require no more than notice of the bankruptcy and failure to have adequate controls in place. But where the act complained of is not on its face an act to collect a debt, the debtor must show, not merely that it could be used for such purpose, but that it was *intended* for that purpose. The debtor has not presented, by way of affidavit or otherwise, any evidence that would tend to support such a conclusion, and the evidence presented by Justice FCU convinces the court that any misreporting of the status of the debt was not done for the purpose of pressuring the debtor into paying it, and, indeed, was unknown to the creditor.

Of course there will be circumstances in which an improper motive may be inferred, thereby shifting the burden to the creditor of showing otherwise. For example, if a creditor, having been informed of the problem, inexplicably fails to take corrective action, a debt collection motive may be inferred (particularly where the creditor fails to respond to the motion to reopen alleging such a motive). In those circumstances, reopening the case to award injunctive relief and attorneys fees might well be appropriate, even in the absence of other provable damages. But that is not the case here. Neither the debtor nor his attorney notified Justice FCU of any problem with the reporting of the discharged debt prior to filing the motion to reopen. Once the issue was brought to its attention, the credit union promptly corrected the report. At oral argument, debtor's counsel conceded that he did not have evidence to prove any financial loss by the debtor other than the attorney's fees incurred in bringing the motion to reopen.

---

3. A stark example of such behavior is documented in an unreported decision from the Eastern District of North Carolina, *In re Rathavongsa*, Case No. 98–00576–5–ATS (Bankr. E.D.N.C., December 18, 2003). Following the debtor's discharge, one of his creditors, Capital One, continued to report an outstanding debt of $9,535. *Id.* at 2. The debtor applied for a loan to purchase a house and was told that the mortgage could not be approved until the Capital One debt was paid, even though the debtor furnished the lender with evidence of his bankruptcy discharge. *Id.* The debtor communicated with Capital One, which flatly refused to change the credit report. In order to go to closing on the purchase of his home, the debtor then paid the debt to Capital One, and thereafter brought a motion for sanctions in the bankruptcy court. *Id.* The court concluded that Capital One had made the credit report "for the purpose of pressuring Mr. Rathavongsa to pay a discharged debt," *id.*, and the court ultimately awarded the debtor compensatory sanctions in the amount of $9,523 and attorneys fees of $4,000 and imposed punitive sanctions in the amount of $10,000. *In re Rathavongsa*, No. 98–00576–ATS (February 4, 2004).

In the absence of a need for injunctive relief or a showing that the debtor is likely to prevail on his contention that the erroneous reporting of the debt as "charged off" was done for the purpose of pressuring the debtor into paying the debt, there is no relief that could be accorded the debtor, and reopening the case would be a waste of judicial resources.

### *ORDER*

For the foregoing reasons, it is

**ORDERED:**

1. The motion to reopen is denied.

2. The clerk will mail a copy of this order, or give electronic notice of its entry, to the parties listed below.