In re Veronica Renee GILES, Debtor.

Veronica Renee Giles, Plaintiff,

v.

James B. Nutter & Co., Defendant.

Bankruptcy No. 09–67840.
Adversary No. 12–5493.

United States Bankruptcy Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 2013.

Latrice L. Latin, The Latin Law Group, LLC, Atlanta, GA, for Plaintiff.

John K. Rezac, Taylor English Duma LLP, Atlanta, GA, for Defendant.

*FINDINGS OF FACT AND
CONCLUSIONS OF
LAW*

JAMES E. MASSEY, Bankruptcy
Judge.

In this adversary proceeding Plaintiff
Veronica Giles asserts that Defendant
James B. Nutter & Co. ("Nutter") violated
the discharge injunction imposed by 11
U.S.C. § 524 giving rise to a claim for
damages, punitive damages, and attorney's
fees. She further asserts that the Court
should impose sanctions on Nutter. The
Court conducted a trial on August 27,
2013. Pursuant to Rule 52 of the Federal
Rules of Civil Procedure made applicable
by Bankruptcy Rule 7052, the Court
makes the following Findings of Fact and
Conclusions of Law.

## FINDINGS OF FACT

**1. Nutter's Loan to Mrs. Giles.** Nutter is a privately owned mortgage banking
company that makes and services home
loans, has 225 to 250 employees and has
about 60,000 customers. In 2005 Nutter
made a loan to Mrs. Giles to enable her to
pay off a prior loan secured by her residence. The new loan is evidenced by a
note dated May 19, 2005 in the original
principal amount of $121,942.00, and the
note is secured by a first priority security
deed on her residence located at 6096 Cowans Mill Road, Douglasville, Georgia (the
"Property"). Mrs. Giles is married, but
only she holds title to the Property. Mr.
Giles is not obligated on the note to Nutter. From the inception of the loan from
Nutter through the trial, Mrs. Giles has
occupied the Property, which was and remained at the time of trial her principal
and only residence.

Payments on the note are due on the
first day of each month; the grace period
is 15 days after the due date. The loan is
insured by the Federal Housing Administration, which is a part of the U.S. Department of Housing and Urban Development
("HUD"). As a lender of a HUD loan,
Nutter must comply with HUD regulations, such as inspections of a property
when the borrower is in default. See
Plaintiff's Exhibit 19.

**2. Bankruptcy.** On March 27, 2009,
Mrs. Giles filed a petition under Chapter 7
of the Bankruptcy Code commencing case
number 09–67840. She listed Nutter as a
creditor in her schedules, and it received
notice of the filing of the case. At the
time she filed her petition she was employed, but her husband was not. He had
filed a disability claim two years earlier
that had yet to be approved.

During the pendency of her bankruptcy
case, Mrs. Giles considered whether to
reaffirm the debt owed to Nutter (that is,
to continue to be personally liable on the
debt), and Nutter sent a form of a reaffirmation agreement to her attorney. Nutter
never contacted Mrs. Giles directly during
the pendency of the bankruptcy case. Ultimately, she decided not to reaffirm the
debt because she was not sure what her
financial situation would be and whether
her husband would get disability.

On July 15, 2009, the Court entered an
order granting Mrs. Giles a discharge and
closing case number 09–67840. Doc. No.
11. The portion of that order dealing with
discharge stated: "It appearing that the
debtor is entitled to a discharge, IT IS
ORDERED: The debtor is granted a discharge under section 727 of title 11, United
States Bankruptcy Code, (the Bankruptcy
Code)." Below the signature line and date
of the order are the following words:
**"SEE THE BACK OF THIS ORDER
FOR IMPORTANT INFORMATION
REGARDING THE BANKRUPTCY
DISCHARGE IN A CHAPTER 7 CASE."**
The heading at the top of the reverse side
of the discharge order states: "EXPLANATION OF BANKRUPTCY DIS-

CHARGE IN A CHAPTER 7 CASE." The explanation is not a part of the order.

Nutter received notice of the entry of the discharge order. Prior to the filing of the bankruptcy case, Mrs. Giles' loan had been handled by Nutter's collection department because she had not been making timely payments. After receiving the notice of the discharge in July 2009, Nutter again assigned the loan to its collection department because Mrs. Giles had failed to make the July 2009 payment by July 16.

**3. Nutter's Policy on Late Payments and Defaults.** At all times after it received the notice of discharge, Nutter was aware that Mrs. Giles was no longer personally liable on the debt. Bruce Huey is the default manager at Nutter and supervises 90 employees. Mr. Huey's testimony showed that Nutter understood that if Mrs. Giles failed to make payments on the loan, its only remedy was to foreclose on her Property. Nutter's employees are instructed by its owner, James B. Nutter, Sr., to do everything possible to avoid foreclosure, and Nutter followed that policy with respect to the loan to Mrs. Giles.

In the latter half of 2011, Nutter changed its policy with respect to loans not reaffirmed in a bankruptcy case. Its new policy is to commence a foreclosure proceeding when such a loan goes into default, but it has yet to apply that policy to the loan to Mrs. Giles, who at the time of the trial was current on the note.

**4. Mrs. Giles' Payment History.** After receiving a discharge, Mrs. Giles decided to make voluntary payments on the mortgage debt because, she said, "I did not want to lose my home." With rare exceptions, Mrs. Giles continued to be unable to make timely mortgage payments to Nutter in August 2009 and thereafter through September 2011. Although not personally liable on the mortgage debt, Mrs. Giles wanted to pay the mortgage debt to Nutter because she "wanted to remain in the house."

When she could not make payments on time, she contacted Nutter to make what she called "payment arrangements." She testified that if she had made a payment arrangement that she could not meet, she would call Nutter, and was in "constant contact with them," to explain the problem and to indicate when she would be able to make that payment.

After questioning Mrs. Giles about making payment arrangements, her attorney asked her to state to the best of her knowledge the most she was late or behind on a payment. Mrs. Giles responded, "44 days at the most." She testified that she was paid on the 15th and the last day of the month, "so that I always tried to make that payment on the 15th."

Mrs. Giles' recollection was faulty. As reflected in the payment history of the loan introduced as Defendant's Exhibit 4, pp. 1–4, Mrs. Giles made only two on-time payments during the 26–month period from August 2009 (following her discharge in July 2009) through September 2011. During that period, she made four payments between 16 days and 29 days after the due date. She made six payments between 30 days and 44 days after the due date. And she made fourteen payments more than 44 days after the due date with respect to the following months: In 2009—September (45 days), October (46 days), November (45 days); 2010—May (45 days), June (48 days), July (46 days), August (50 days), December (48 days); 2011—January (46 days), February (49 days), April (46 days), May (47 days), July (53 days) and August (46 days).

**5. Mrs. Giles' Contentions.** In her amended complaint, Mrs. Giles contended that Nutter violated the discharge injunction by contacting her by telephone regarding delinquent payments, by sending

her letters about delinquent payments, by reporting unpaid balances on the debt to credit reporting agencies, and by causing persons with inspection companies to enter upon her Property and to leave notes concerning collection of debt.

**5.A. Telephone Calls.** Mrs. Giles testified that she placed calls to Nutter before and after filing bankruptcy to make payment arrangements when she could not make a payment on time. Nutter placed calls to Mrs. Giles or her husband or both at certain times when a payment was in arrears. When asked at one point on cross-examination whether it was true that Nutter called her about late payments, Mrs. Giles volunteered that she "contacted them first" but agreed that they also called her. Mrs. Giles introduced no records of when she made or received calls. Nutter kept a "Consolidated Diary History," introduced as Defendant's Exhibit 6, showing when telephone calls were made and received and when letters were sent to Mrs. Giles, among other data, although Nutter concedes that there could have been contacts with Mrs. Giles or her husband that were not recorded.

As shown in the Consolidated Diary History, Nutter's personnel placed nine calls to either or both Mrs. Giles and Mr. Giles and received five calls from Mrs. Giles in 2009 after July 15. Its records reflect that in 2010, its personnel placed thirteen calls to either or both Mrs. Giles and Mr. Giles and received five calls from Mrs. Giles or Mr. Giles. Its records reflect that in 2011 through September 10, its personnel placed fourteen calls to either or both Mrs. Giles and Mr. Giles and received thirteen calls from Mrs. Giles or Mr. Giles. Nutter's telephone calls to Mrs. Giles and her husband regarding the loan was in the ordinary course of business between Nutter and Mrs. Giles.

Many entries of calls made by Nutter in the Consolidated Diary History show the date and time of the call and telephone number dialed but nothing else. Nutter used two telephone numbers, one presumably for Mrs. Giles and the other for Mr. Giles. Some entries state that a message was left, e.g., Plaintiff's Ex. F5, p. 17 for 2/11/2011, ("LM W/MAN [Tel. No.]"). Of the 36 calls placed by Nutter personnel in the 23–month period from August 2009 through June 2011, 26 calls were in pairs, which is to say that each of the two telephone numbers was called within three or four minutes. In most instances, there is no notation with respect to the first number called, presumably indicating that no one answered. When one of such paired calls is eliminated Nutter initiated only 23 calls during the 23–month period, not all of which may have been answered. Nutter placed no calls during the period from January 2010 through May 2010. Mrs. Giles was in default on payments by more than 44 days in fourteen of the eighteen months in which calls were made.

The vast majority of entries in the Consolidated Diary History about calls received from Mrs. Giles show that she was promising to make a late payment at a future date. These are presumably the "payment arrangements" about which Mrs. Giles testified.

Mrs. Giles does not contend, and there is no evidence to show, that Nutter's personnel ever told her or her husband by telephone or otherwise that she was personally liable for a missed payment or threatened a lawsuit or any other action to collect a past due payment as a personal liability of Mrs. Giles.

In mid-June 2011, Mrs. Giles sent a letter to Nutter requesting that it stop making telephone calls to two telephone numbers (for herself and her husband), which are the numbers that appear in entries in the Consolidated Diary History. There is no evidence that Nutter personnel

initiated a telephone call to Mrs. Giles or Mr. Giles after June 2, 2011, except to return a call.

The pattern of telephone calls initiated by Nutter at consistent intervals following defaults, the consistent purpose of those calls to find out when Mrs. Giles could make a payment, her acceptance of those calls and Nutter's acceptance of calls from her and her husband concerning late payments show that the making of those telephone calls was in the ordinary course of business between Nutter and Mrs. Giles.

**5.B. Letters.** After July 15, 2009 and before September 30, 2011, a period of 26 months, Nutter sent letters to Mrs. Giles informing her that she had missed payments. The Consolidated Diary History reflects 34 such letters. In every instance, the payment had not been made by the end of the grace period, and with respect to approximately 21 of those letters, Mrs. Giles was delinquent by 44 days or more. Most of the letters were paired in that one letter went out after the payment was not made by the 15th of the month, and the second letter was generated on the 25th of the month if the loan was still delinquent.

One form of correspondence from Nutter, probably the most common one, states in relevant part:

> Your mortgage is delinquent for the [date] payment. On [date] your loan will be in default.... It is important to note, (sic) we may report information about your account to credit bureaus. Late payments, missed payments, or other defaults on your account may be reflected in your credit report.

E.g., Plaintiff's Exhibit 4. The last two sentences above appear in other forms of letters sent to Mrs. Giles. Plaintiff's Exhibits 6, 11, 12 and 15.

A letter dated January 4, 2011, stated in part: "If you do not call counseling department ... you may lose your home.... If these payments [for December 2010 and January 2011] are not received by January 17, 2011 you could lose your home." Plaintiff's Exhibit 5.

A letter dated September 12, 2011 stated in part:

> As of today's date your mortgage payments for August and September remain unpaid. Our records indicate that you have failed to contact our office to make suitable payment arrangements to bring your loan current.
>
> The delinquent status of your account cannot continue. YOU MUST BRING THIS LOAN TO A CURRENT STATUS IMMEDIATELY.
>
> ... unless other arrangements are made immediately, your loan could be referred to the holder of your mortgage for legal action resulting in additional expense to you....
>
> It is important to note, (sic) we may report information about your account credit bureaus. Like payments, missed payments, or other defaults on your account may be reflected in your credit report.

Plaintiff's Exhibit 13. A letter dated September 14, 2011 stated in part: "late payments received after 5:00 PM CDT on the last calendar day of the month will be reported to the credit bureaus." Plaintiff's Exhibit 14.

Mrs. Giles testified that at times she would receive letters and calls after she had made "payment arrangements," but she did not provide dates or the number of instances. For that reason it is impossible to say whether Nutter was ignoring a "payment arrangement," or the left hand of Nutter did not know what the right hand was doing or Nutter's computer system was automatically generating letters based on the number of days the payment was past due. The Court does not regard such instances as credible evidence that Nutter was attempting to improperly col-

lect a payment that Mrs. Giles not did not want to make. All the while, Mrs. Giles made it clear to Nutter that she wished to make all monthly payments.

Mrs. Giles introduced no evidence showing that Nutter reported a past due payment or delinquency of Mrs. Giles to a credit reporting bureau or that it took any legal action of any kind to collect the discharged debt. She introduced no evidence to show that the purpose of sending those letters was to collect the debt as her personal liability as opposed to helping her avoid foreclosure. These letters, obviously forms, were merely reminders that payments were late, which Mrs. Giles clearly understood.

Mrs. Giles never complained about letters sent to her by Nutter, and in the letter she sent to Nutter in mid-June 2011 to ask that it stop making telephone calls, Mrs. Giles authorized Nutter to continue to contact her by mail.

Nutter's pattern of sending letters to Mrs. Giles at consistent intervals following defaults, the absence of any complaint concerning those letters or their content, and Mrs. Giles' authorization of continued contact with her by mail in June 2011 show that the sending of those letters by Nutter to her regarding late payments on the loan was in the ordinary course of business between Nutter and Mrs. Giles.

**5.C. Statements by Nutter to Credit Reporting Agencies.** Nutter concedes that it reported the declining balances on the loan to credit reporting agencies. Plaintiff's Exhibit 1. On September 29, 2010, Mr. Giles telephoned Nutter to complain that Nutter was reporting credit balances to credit reporting agencies and demanded that Nutter pay $11,000 for eleven "violations" of law. In a recording of that conversation made by Mr. Giles, who is not an attorney, told the person at Nutter with whom he spoke that Nutter had violated the automatic stay. The automatic stay

had automatically ended, however, on July 15, 2009, when Mrs. Giles' bankruptcy case was closed.

The first page of Plaintiff's Exhibit 1 shows that it is page 23 of a 36-page credit report of Experian as of September 23, 2010. Mr. Giles expressed his opinion that reporting credit balances as shown on that one page indicated that Mrs. Giles continued to be personally liable on the note. The limited information on that one page cannot logically support Mr. Giles' conclusion. Mrs. Giles' debt to Nutter existed in 2010 and exists now. That is all that page shows—the amount of the debt. Nothing on that page indicates whether or not Mrs. Giles was liable personally on that debt.

Nutter made no further reports of the declining balance on the loan after September 2010.

As already stated, there was no evidence that Nutter ever reported a late payment of a debt to a credit reporting agency. Mrs. Giles offered no evidence to show that Nutter reported declining balances on the mortgage debt secured by Mrs. Giles' house for the purpose of attempting to collect any portion of the debt as a personal liability of Mrs. Giles. To do so, she would have had to show that Nutter informed her of what it had reported to credit reporting agencies, and she made no such showing and has never even made that contention. Mr. Huey credibly testified that the reporting of the balances on the debt was not for the purpose of shaming or attempting to force Mrs. Giles to pay the debt.

**5.D. Inspections of Mrs. Giles' House and Notes Left There.** On numerous occasions after July 15, 2009 through September 2009, Nutter employed agents to inspect Mrs. Giles' house to see that it was occupied. Mrs. Giles testified that inspectors were coming to her house "pretty early after . . . discharge."

As Mr. Huey, Nutter's default manager, testified and as Plaintiff's Exhibit 15 confirms, a holder of a HUD loan must inspect the property for occupancy if the borrower is in default and no payment has been received in 45 days from the due date. To comply with this regulation, Nutter made it its policy to inspect a property if the borrower is 31 days in arrears to make certain it is in compliance with HUD policies. Mr. Huey credibly testified that the only reason that Nutter conducts inspections is to comply with HUD regulations. Nutter alone bears the costs of inspections. He further testified that the purpose of the inspections, which would not have been done but for governmental regulations, was not to force Mrs. Giles to make a payment. The only purpose of an inspection was to verify occupancy so as to pass audits by HUD. Some of the inspections of Mrs. Giles' house were visual, but in others the inspector came onto the Property and left a note if the inspector observed no one occupying the house.

On some occasions, the inspection company employed by Nutter left on the garage door or front door a preprinted form of a "calling card" with the name of Mrs. Giles and Nutter's name and its telephone number handwritten on the form. One such form admitted as Plaintiff's Exhibit 7 stated in relevant part:

Ms. V. Giles

This is in connection with an attempt to collect a debt. Any information obtained will be used for that purpose. It is important that we talk to you.

Please call: J B Nutter & Co

800 315 7334

**NOTE:** If this matter has been resolved with one of our staff within the last 10 days, or definite arrangements were made prior to that date, kindly disregard this request.

Thank you.

The Consolidated Diary Report, Defendant's Exhibit 5, shows sixteen reports of an inspection company employed by Nutter between October 2009 and September 2011. The Consolidated Diary Report states that a "call card" was left each time. Plaintiff's Exhibits Nos. 7, 8 and 17 are copies of "call cards." Those inspections occurred in October through December of 2009; June through December 2010, and January through June and September of 2011. Defendant's Exhibit 6, pp. 1–16, are copies of the reports for these inspections.

Mr. Huey testified that inspection reports were ordered when a borrower was 31 days in arrears, so that if an inspection takes place in September, it is because the borrower was more than 30 days in arrears with respect to the payment due on August 1. For each month preceding the months in which the inspections occurred, Mrs. Giles was in default 31 days or more. Mrs. Giles never observed any of these inspections.

Mr. Huey credibly testified that the purpose of leaving a "call card" when no one was home was to inform a borrower to call Nutter to make arrangements to make the past due payments. To that limited extent he candidly admitted that Nutter's purpose in having an inspection company leave such a note was to encourage the borrower to make the payment. It bears repeating, however, that Mrs. Giles very much wanted to make those payments because she wanted to keep her home.

On June 10, 2011, Mr. and Mrs. Giles telephoned Nutter and spoke to Mr. Huey to complain about inspections and to demand that inspections cease. This was the first complaint that they lodged with Nutter about inspections. Mr. Huey testified that Nutter then changed the handling of Mrs. Giles' account so that an order for an inspection, which would have been triggered by a delinquency over 30 days,

would be manually cancelled. There was no inspection in July, and because Mrs. Giles made the June payment in June, the absence of a July inspection would not show that Nutter had attempted to end such inspections. Mrs. Giles did not make the payment due on July 1 until August 23, however. Yet, there was no inspection made in August, which indicates that the change in procedure that Mr. Huey made to stop inspections was working.

Unfortunately, as Mr. Huey testified, an order placed for an inspection in September 2011 with respect to the August delinquency was not manually pulled. On September 11, 2011, an inspector looked through a window into the garage of Mrs. Giles' house. (There is some evidence that the inspection could have occurred on September 10, but the exact date is immaterial.) Mr. Giles was meeting with a few of his friends in that room and noticed the inspector. The inspector left a call card with Mr. Giles. He became angry and demanded that the inspector leave the Property, which the inspector did. There is no evidence showing any further inspection in which an inspector entered onto Mrs. Giles' Property. Mrs. Giles has not contended that she made the August payment because the inspection company left a call card with her husband or would not have made it had that inspection not occurred.

The consistent timing of inspections after a default exceeding 30 days and the fact that Mrs. Giles never complained about inspections until June 2011 show that the making of those inspections, including the leaving of a call card, was in the ordinary course of business between Nutter and Mrs. Giles.

**6. Mrs. Giles' Evidence on Damages.** There is none. The Amended Complaint filed by Mrs. Giles entitled "AMENDED COMPLAINT SEEKING DAMAGES FOR VIOLATION OF THE DIS-CHARGE INJUNCTION" fails to allege a single fact showing that Mrs. Giles suffered any injury as a result of any act or omission of Nutter related to the mortgage debt secured by Mrs. Giles' house.

She offered no evidence to show that she suffered any damage resulting from telephone calls made to her by Nutter or from mail it sent to her.

In paragraph 18 of the amended complaint, Mrs. Giles alleged that the balances owed to Nutter shown on the Experian credit report dated September 23, 2010 "directly affects Mrs. Giles (sic) credit report by debt to income ratio and her credit score." But neither the page of that credit report admitted as part (page 1) of Plaintiff's Exhibit 1 nor any other exhibit, showed Mrs. Giles' income, a debt to income ratio or a credit score. Mrs. Giles offered no evidence that she was denied credit or suffered any other financial adversity caused by the reporting of balances on the note to credit bureaus.

Mrs. Giles did not show how a debt to income ratio was a rational way to view her creditworthiness—surely on a credit application, she would have had to show she was making mortgage payments on Nutter's loan, thereby reducing her ability to pay any new debt she might incur. She would have had to reflect the mortgage debt on both the Nutter loan and the sizeable second mortgage debt if she showed the Property as an asset. Mrs. Giles conceded that the mere fact that she filed bankruptcy hurt her credit rating. Under these circumstances, Mrs. Giles' contention that reporting of credit balances on the debt secured by her Property hurt her credit rating is frivolous.

Mrs. Giles' husband became angry after an inspector came onto her Property on September 11, 2011, but she failed to offer any evidence to show that she was damaged in any way whatsoever by that or any

other inspection of her Property made by an agent of Nutter and in particular by an inspector entering onto the Property without permission.

Mrs. Giles failed to prove that she has incurred any attorney's fees with regard to this adversary proceeding or otherwise.

**7. Mrs. Giles' Legal Actions Against Nutter.** On January 30, 2012, Mrs. Giles filed Adversary Proceeding No. 12–5083 against Nutter for alleged violations of the discharge injunction, the Fair Debt Collection Practices Act, and the Fair Credit Reporting Act. She made no effort to serve that complaint. On March 8, 2012, Mrs. Giles amended her complaint to add two more defendants, which were companies that performed inspections. The amended complaint asserted claims for alleged violations of the discharge injunction, Fair Debt Collection Practices Act, and the Georgia Fair Business Practices Act and for damages for alleged invasion of privacy and trespass. On June 8, 2012, Nutter moved to dismiss the complaint. On June 28, 2012, Mrs. Giles voluntarily dismissed that adversary proceeding. Mr. Huey testified that prior to being sued by Mrs. Giles, Nutter had never been sued for violating the discharge injunction.

On October 9, 2012, Mrs. Giles filed her complaint initiating the present adversary proceeding. Mrs. Giles has still another action pending before the United States District Court for the Northern District of Georgia, apparently involving the same facts.

## CONCLUSIONS OF LAW

**1. No Separate Injunction in Discharge Order and Effect of Section 524(j).**

■ Section 524(a)(2) of the Bankruptcy Code, 11 U.S.C. § 524(a)(2), provides:

(a) A discharge in a case under this title—

. . .

(2) operates as an injunction against the commencement or continuation of an action, the employment of process, or an act, to collect, recover or offset any such debt as a personal liability of the debtor, whether or not discharge of such debt is waived[.]

The grant of the discharge in the July 15, 2009 discharge order made the injunction in section 524(a)(2) applicable to all of Mrs. Giles' creditors, including Nutter.

The explanation of the discharge on the back side of the July 15, 2009 discharge order included the following statement:

"Collection of Discharged Debts Prohibited"

The discharge prohibits any attempt to collect from the debtor a debt that has been discharged. For example, a creditor is not permitted to contact a discharged debtor by mail, phone, or otherwise, to file or continue a lawsuit, to attach wages or other property, or to take any other action to collect a discharged debt from the debtor.

[In a case involving community property:] [There are also special rules that protect certain community property owned by the debtor's spouse, even if that spouse did not file a bankruptcy case.]

Mrs. Giles' amended complaint alleged that the "discharge order signed by the Court on July 15, 2009, and mailed to the Defendant contains the following language" and then quoted the statement set out above. Amended Complaint, Doc. No. 10, Part 1, p. 4. Mrs. Giles and her counsel apparently read the above statements literally and concluded that Nutter's contacts with her by telephone, letter and inspections at her Property were violations of the discharge injunction. To the extent that they relied on the statements on the back of the order in reaching their conclusions, they are mistaken. The information pro-

vided on the back of the discharge order is not part of that order, as it makes clear.

The statements quoted above are an attempt to explain in layman's terms what section 523(a)(2) provides. In doing so, it is accurate in the vast majority of instances in which a creditor might attempt to collect a discharge debt as if there had never been a bankruptcy case. But section 523(a)(2) does not enjoin any effort by anyone to collect a discharged debt under any circumstances. By its terms, it only applies to act to collect or recover a discharged debt as a "personal" liability of the debtor. The explanation on the back of the discharge order also omits to point out an exception to section 524(a)(2) applicable to cases such as this one in which the debt in question is secured by the debtor's principal residence and certain other conditions are met.

In 2005, Congress passed the Bankruptcy Abuse Prevention and Consumer Protection Act ("BAPCPA"), Pub.L. 109–8, 119 Stat. 23 (2005), applicable to cases filed on or after October 17, 2005. The BAPCPA amended section 524 to add a new subsection (j). Section 524(j) provides:

> (j) Subsection (a)(2) does not operate as an injunction against an act by a creditor that is the holder of a secured claim, if—
>
> (1) such creditor retains a security interest in real property that is the principal residence of the debtor;
>
> (2) such act is in the ordinary course of business between the creditor and the debtor; and
>
> (3) such act is limited to seeking or obtaining periodic payments associated with a valid security interest in lieu of pursuit of in rem relief to enforce the lien.

The "ordinary course of business" of a debtor or other party is obviously the normal or usual business practices in the relevant business dealings. The phrase "ordinary course of business" also appears in several other sections of the Bankruptcy Code in various contexts but is not defined in any of these sections, leaving it to the courts to articulate the factors to be considered in determining whether a particular transaction or act is or is not in the ordinary course of business. For example, in the context of section 547(c)(2), dealing with a defense to a preference claim, the Court of Appeals for the First Circuit stated:

> The statute [547(c)(2)] itself is uninstructive as to the definition of the term "ordinary course of business." Courts abhor interpretive vacuums, and they have filled this one, articulating several factors that bear upon whether a particular transfer warrants protection under section 547(c)(2). These factors include the amount transferred, the timing of the payment, the historic course of dealings between the debtor and the transferee, and the circumstances under which the transfer was effected.

*In re Healthco Intern., Inc.*, 132 F.3d 104, 109 (1st Cir.1997).

The focus in section 524(j)(2) is on the normal or usual practices between the creditor and the debtor occurring after the entry of the discharge order. The salient factors include the timing of contacts, the purpose of the contacts, and variations in the overall pattern of contacts, all of which were discussed above in the Findings of Fact.

Nutter proved all three elements of section 524(j) with respect to acts involving telephone calls, sending letters and making inspections of the Property (with one exception) that Mrs. Giles contends constituted violations of section 523(a)(2). First, Nutter continued to hold a security interest in the Property to secure the note of Mrs. Giles after the entry of the discharge order in this case. At all relevant times,

the Property was the principal residence of Mrs. Giles.

Second, the acts of making telephone calls to Mrs. Giles regarding late payments on the note, sending letters to Mrs. Giles regarding late payments, and making inspections of the Property, other than the inspection made on September 11, 2011, were in the ordinary course of business between the parties.

Third, all of the acts of Nutter were limited to seeking the late payments on the note so that it would not be forced to foreclose, which it knew was its only remedy and which was consistent with its longstanding policy on all of its loans. There is no evidence that Nutter's communications with Mrs. Giles were for the purpose of coercing her into making a payment she did not want to make. Therefore, the discharge injunction did not apply to the making of telephone calls, sending of letters or conducting inspections of the Property with the exception of the inspection conducted on September 11, 2011.

### 2. September 11, 2011 Inspection Not an Act to Collect Debt as Personal Liability.

■ The September 11, 2011 inspection did not violate section 523(a)(2) because Nutter's purpose was not to collect the August or September 2011 payments as the personal liability of Mrs. Giles and Mrs. Giles did not contend otherwise. The purpose of the inspection was to determine occupancy in order to insure compliance with HUD regulations. Nutter may or may not have been mistaken that in believing that its conducting an inspection before the 45th day after payment was due would always comply with the relevant HUD regulation. But whether or not the inspection met HUD requirements, Nutter's purpose was to comply with those regulations, and not to collect late payments as her personal liability.

■ Leaving a call card at the Property stating that "this is in connection with an attempt to collect a debt" might seem at first blush to be a violation of the discharge injunction, but an act must be judged in context to determine its true nature. A debtor who receives a discharge is free to voluntarily repay a debt that was not reaffirmed and a creditor does not violate the discharge injunction by accepting it. 11 U.S.C. § 524(f). Nutter did wish to collect late payments from Mrs. Giles, as Mr. Huey candidly stated. But the context in which the call card was left was one in which Mrs. Giles had consistently communicated with Nutter that she wanted to make payments on the debt to keep the Property and in which Nutter's policy was to collect mortgage payments so as to avoid having to foreclose on the Property. The purpose of leaving the call card was, Mr. Huey testified, to encourage the customer to contact Nutter about the late payment. The evidence reveals not the slightest hint of a desire by Nutter to collect a payment from Mrs. Giles that she did not wish to voluntarily make. Under these circumstances, the leaving of the calling card on September 11, 2009 was not an act to collect the late payment as Mrs. Giles' personal liability.

■ If section 524(j) were not applicable in this case, the same analysis would apply to the making of telephone calls, the sending of letters and all other inspections of the Property. "A finding of civil contempt must be based on 'clear and convincing evidence' that a court order was violated. *Jordan v. Wilson,* 851 F.2d 1290, 1292 n. 2 (11th Cir.1988); *Sizzler Family Steak Houses v. Western Sizzlin Steak House, Inc.,* 793 F.2d 1529, 1534 n. 4 (11th Cir. 1986)." *Jove Engineering, Inc. v. I.R.S.,* 92 F.3d 1539, 1545 (11th Cir.1996). Because the relief sought for an alleged violation of the discharge injunction is to hold the creditor in contempt, the debtor must

prove the violation by clear and convincing evidence.

Mrs. Giles failed to prove even by a preponderance of the evidence that these acts were an effort to collect the debt as her personal liability. Nutter's focus was helping her avoid a foreclosure, which it and she knew was its only remedy. By far the most important fact in this case is that Mrs. Giles wanted to make and made every monthly payment to Nutter because she wanted to keep her home. Notwithstanding the language in the call cards left on the Property, which she ignored until September 11, 2011, Nutter's purpose was to prompt her to make the payments she wanted to make to avoid foreclosure, not to recover from her any payment she did not want to make.

### 3. No Violation of Discharge Injunction by Reporting Balances of Debt.

█ Mrs. Giles' contention that reporting the declining balances on her debt secured by her Property constituted a violation of section 523(a)(2) is without merit. She made no showing that the reporting of balances on the mortgage debt was an act to collect the debt as her personal liability.

█ What Mrs. Giles overlooks is that a "discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt." *Matter of Edgeworth*, 993 F.2d 51, 53 (5th Cir.1993). Because the debt exists, its reporting alone is not a violation of the discharge injunction absent a showing that the purpose or effect of the reporting was to collect the discharged debt as a personal liability of the debtor. *In re Mahoney*, 368 B.R. 579, 584 (Bankr.W.D.Tex.2007) ("mere reporting of credit information about a debtor vel non is not an 'act' to collect a discharged debt...."); *In re Irby*, 337 B.R. 293, 295 (Bankr.N.D.Ohio 2005) ("[I]t is difficult to discern how—and

therefore, the Court cannot concluded (sic) that—the sole act of reporting a debt, whose existence was never extinguished by the bankruptcy discharge, violates the discharge injunction. All that is being reported is the truth."); *In re Vogt*, 257 B.R. 65, 70 (Bankr.D.Colo.2000) (The reporting of debt as still due, standing alone, does not violate the discharge injunction).

In *In re Jones*, 367 B.R. 564, 569–570 (Bankr.E.D.Va.2007), the debtor sought to reopen his closed Chapter 7 case to bring an action for violating the discharge injunction against a creditor that reported the discharged debt to a credit reporting agency as having been "charged off." The court denied the motion to reopen because the act complained of did not violate the discharge injunction. The court explained:

[A] distinction must be made between acts which have as their direct and natural purpose the collection of debts and acts which have some other lawful purpose but could also be used (or, more accurately, misused) to coerce payment of a debt. The reporting of a delinquent debt to a credit reporting agency is not inherently an act to collect a debt but rather to share information relevant to credit granting decisions. A creditor reports both performing and delinquent accounts in the expectation that other credit grantors will do the same, enhancing each creditor's ability to evaluate proposed credit transactions and to avoid extending credit or making loans to poor credit risks.

... But where the action complained of does not on its face constitute an act to collect a debt, the burden is on the debtor to show that the creditor took the challenged action for the specific purpose of collecting a discharged debt.

367 B.R. at 569–570.

Mrs. Giles first learned of such reports in late September 2010. Hence, the reporting of declining balances could not

possibly have been for the purpose of coercing her to make a payment. After her husband complained to Nutter about reporting the declining balances on the loan, the reporting ceased. Mrs. Giles did not show how reporting that she was making payments without reporting that she was regularly in default had a negative impact on her ability to obtain new credit. Nutter proved that its purpose in making such reports to credit reporting agencies had nothing to do with the collection of note payments from Mrs. Giles as her personal liability. She did not rebut that evidence.

### 4. No Private Right of Action under Section 524(a)(2).

Mrs. Giles asserts that she is entitled to collect damages from Nutter for violations of the discharge injunction. The Court has found that she failed to prove damages and that there has not been a violation of the discharge injunction. Because this Court may not have the final word on its conclusions, however, the question of whether a private right of action exists for violating the discharge action should be addressed.

Nothing in section 524 of the Bankruptcy Code suggests that Congress intended to create a private right of action for violation of a discharge injunction. "[T]he fact that a federal statute has been violated and some person harmed does not automatically give rise to a private cause of action in favor of that person." *Cannon v. University of Chicago*, 441 U.S. 677, 688, 99 S.Ct. 1946, 1953, 60 L.Ed.2d 560 (1979). Rather, the statute that must "display an intent to create not just a private right but also a private remedy. Statutory intent on this latter point is determinative. Without it, a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter, or how compatible with the stat-

ute." *Alexander v. Sandoval*, 532 U.S. 275, 286–87, 121 S.Ct. 1511, 149 L.Ed.2d 517 (2001) (internal citations omitted).

Congress knew how to create a private right of action in the Bankruptcy Code. Section 362(k) of the Bankruptcy Code creates a private right of action for an individual injured by a willful violation of the automatic stay imposed by section 362(a). Like section 524, section 362(a) imposes an injunction against enumerated acts. But section 524 contains no provision creating or even implying a private cause of action for violating the discharge injunction.

This Court agrees with the three courts of appeal that have considered this issue that there is no private cause of action for violating the discharge injunction. *Walls v. Wells Fargo Bank, N.A.*, 276 F.3d 502, 507 (9th Cir.2002)(holding that there is no private cause of action implicit in § 524, and that the proper redress lies in the court's contempt power); *Cox v. Zale Delaware, Inc.*, 239 F.3d 910, 917 (7th Cir.2001)(holding that, because § 524 has no punitive damages provision analogous to punitive damages under § 362(h) for violation of the automatic stay, a violation of § 524(c) can be brought only as a contempt action); *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 422 (6th Cir.2000)(holding that a private cause of action is inappropriate, where § 524(a) creates an injunction and the traditional remedy for violation of an injunction is a contempt proceeding). See also, *In re Joubert*, 411 F.3d 452, 456 (3rd Cir.2005) ("We agree with the reasoning of these cases [*Pertuso* and *Walls* ], and see no reason why the rule should be different for actions asserted under § 506(b) rather than § 524.").

### 5. Sanctions.

In support of the position of Mrs. Giles that sanctions should be imposed on

Nutter, her counsel cited several cases in a footnote to a proposed pretrial order that was filed by counsel but never entered as an order by the Court. Notice of [Proposed] Consolidated Pretrial Order, Doc. No. 27, p. 6. Although Debtor's counsel provided no citations for those cases, the Court has found and read them. They are: *In re Wassem,* 456 B.R. 566 (Bankr. M.D.Fla.2009); *In re Wallace,* 2011 WL 1335822 (Bankr.M.D.Fla.2011); *In re Humphrey,* 2012 WL 868730 (Bankr. M.D.Fla.2012); *In re Mooney,* 340 B.R. 351, 355 (Bankr.E.D.Tex.2006); *In re Powell,* 2012 WL 2412042, *1 (Bankr.E.D.N.C. 2012); *In re Perviz,* 302 B.R. 357 (Bankr. N.D.Ohio 2003); and *In re Adams,* 2010 WL 2721205 (Bankr.E.D.N.C.2010).

Mrs. Giles' counsel described those cases as involving "debtors that have secured properties" and creditors that ignored the discharge injunction after being warned by counsel for each respective debtor. Comparing those cases to this one, counsel opined that Nutter's "conduct can be expressed as egregious with malevolent intent and with a clear disregard for Bankruptcy." Notice of (Proposed) Consolidated Pretrial Order, Doc. No. 27, p. 6.

Each of the cited cases involved a debt secured by property, but in only one of them did the court find that the debtor remained in the property. In that one case, *In re Adams,* the court had fixed the amount of debt owed in an order that directed the creditor to correct its records, the creditor thereafter ignored the court's order, repeatedly overstated the debt in statements to the debtors, failed to correct the errors after being notified by the debtors, and reported the overstated debt to credit reporting agencies, thereby frustrating the debtors' efforts to refinance the debt, thereby. The *Adams* court held the creditor in contempt for violating its order

fixing the amount of the debt. It also held that the discharge injunction was violated, but it is not clear why. This was a Chapter 13 case, and 11 U.S.C. § 1328(a)(1) excepts from a discharge a debt under section 1322(b)(5), debts with respect to which the last payment is after the last date on which a plan payment is due. The *Adams* court did not explain how the debt, which was apparently still owed after the case was closed, could have been discharged.

In all of the remaining cases cited by Mrs. Giles' counsel, none of the debtors was occupying the property securing a debt and none of them wanted to pay the debt. In each of those cases, a lawyer for the debtor contacted the creditor demanding that collection attempts stop, and each creditor repeatedly ignored the demand.

Unlike the facts in these cases, Mrs. Giles still lives in her Property, always wanted to pay the debt and informed Nutter that she wanted to pay the debt. Nutter did not ignore demands by Mrs. Giles to cease certain actions such as making telephone calls, except for the September 11, 2011 inspection, which Nutter had authorized, but by mistake. The difference between those cases and this one is the difference between night and day. The cases cited by Mrs. Giles's counsel are thus inapposite.

 Nonetheless, it is clear that this Court has the power to sanction a creditor that thumbs its nose at the discharge injunction.

Bankruptcy judges, like district judges, have the power to coerce compliance with injunctive orders. In the bankruptcy context, "the creditor who attempts to collect a discharged debt is violating not only a statute but also an injunction and is therefore in contempt of the bankruptcy court that issued the order of discharge." *Cox v. Zale Del., Inc.,* 239 F.3d 910, 915 (7th Cir.2001)

(citing *Pertuso v. Ford Motor Credit Co.*, 233 F.3d 417, 421 (6th Cir.2000); *Ins. Co. of N. Am. v. NGC Settlement Trust & Asbestos Claims Mgmt. Corp. (In re Nat'l Gypsum Co.)*, 118 F.3d 1056, 1063 (5th Cir.1997)); accord *Hardy v. United States ex rel. I.R.S. (In re Hardy)*, 97 F.3d 1384, 1390 (11th Cir. 1996) ("[Creditor] may be liable for contempt ... if it willfully violated the permanent injunction of § 524." (emphasis omitted)).

*Alderwoods Group, Inc. v. Garcia*, 682 F.3d 958, 966 (11th Cir.2012).

Because Nutter has not violated the discharge injunction, no sanction can or should be imposed.

\* \* \*

Based on these Findings of Fact and Conclusions of Law, the Court will enter a separate judgment in favor of Nutter that it has not violated the discharge injunction and that Plaintiff is not entitled to recover anything from Nutter. The Clerk is directed to serve a copy of these Findings of Fact and Conclusions of Law on the attorneys for each party.

**IT IS ORDERED.**